IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN PAUL MAC ISAAC | § | |
| | § | |
| Plaintiff/Counterclaim | § | No. 448, 2024 |
| Defendant Below, | § | |
| Appellant/Cross-Appellee, | § | |
| | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| POLITICO LLC, | § | C.A. No. S22C-10-012 (S) |
| ROBERT HUNTER BIDEN, and | § | |
| BFPCC, INC. | § | |
| | § | |
| Defendants/Counterclaim | § | |
| Plaintiff Below, | § | |
| Appellees/Cross-Appellant. | § | |

Submitted: June 4, 2025
Decided: August 25, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en banc*.

Upon appeal from the Superior Court: **AFFIRMED.**

Ronald G. Poliquin, Esquire, THE POLIQUIN FIRM, LLC, Dover, Delaware; Joseph D. Stanley, Esquire, SCHWARTZ & SCHWARTZ, P.A., Dover, Delaware; Brian Della Rocca (*argued*), DELLA ROCCA LAW, LLC, Gaithersburg, Maryland *for Plaintiff and Counterclaim Defendant Below/Appellant and Cross-Appellee John Paul Mac Isaac.*

Bartholomew J. Dalton, Esquire, Connor C. Dalton, Esquire, Jessica L. Needles, Esquire, DALTON & ASSOCIATES, P.A., Wilmington, Delaware; Abbe David Lowell, Esquire, David A. Kolansky, Esquire (*argued*), LOWELL & ASSOCIATES, PLLC, Washington, D.C. *for Defendant and Counterclaim Plaintiff Below/Appellee and Cross-Appellant Robert Hunter Biden.*

David J. Margules, Esquire, BALLARD SPAHR LLP, Wilmington, Delaware; Lauren R. Russell, Esquire BALLARD SPAHR LLP, Washington, D.C.; Kaitlin M.

Gurney, Esquire (*argued*), BALLARD SPAHR LLP, Philadelphia, Pennsylvania *for the Defendant Below/Appellee Politico LLC.*

Joseph M. Turk, Esquire, BFPCC, INC., Wilmington, Delaware; David J. Burman, Esquire, John M. Devaney, Esquire, PERKINS COIE LLP, Washington D.C. *for the Defendant Below/Appellee BFPCC, Inc.*

**TRAYNOR**, Justice, for the Majority:

This is an appeal from a Superior Court opinion and order that dismissed a computer-repair-shop owner's defamation claims against a customer, various news outlets, and a political campaign committee, as well as counterclaims brought by the customer against the shop owner. For the reasons that follow, we have concluded that the Superior Court did not err when it held that the allegedly defamatory statements did not concern the plaintiff shop owner and thus were not actionable. Likewise, given the manner in which the customer framed his counterclaims and argued against dismissal in the Superior Court, the court's dismissal of the customer's counterclaims on statute-of-limitations grounds was justified. Hence, we affirm the Superior Court's order.

I

A

John Paul Mac Isaac owned and operated a computer repair business in Wilmington called The Mac Shop.[1] Mac Isaac claims that, in April 2019, Robert Hunter Biden,[2] son of then-former Vice President Joseph R. Biden Jr., came to The

---

[1] We derive the facts relevant to the motions to dismiss from the pleadings and the documents incorporated by reference in the pleadings. We derive the facts relevant to the motion for summary judgment from the pleadings, the documents incorporated by reference in the pleadings, and the limited discovery conducted by the parties.

[2] To avoid confusion, this opinion refers to Robert Hunter Biden by his surname and his father, former President Joseph Biden, by his full name.

3

Mac Shop looking to recover data from a damaged laptop.[3]  Mac Isaac agreed to recover the data, so Biden left his laptop at the shop.  Before leaving the shop, Biden signed a repair authorization form.  The repair authorization stated, among other things, that "[e]quipment left with the Mac Shop after 90 days of notification of completed services will be treated as abandoned and [the customer] agrees to hold the Mac Shop harmless for any damage or loss of property."[4]

The following day, at Mac Isaac's request, Biden returned to The Mac Shop and dropped off an external hard drive onto which Mac Isaac was to transfer the recovered data from the laptop.  Mac Isaac finished recovering and transferring the data later that day and called Biden to let him know that the data recovery was complete.  A few days later, Mac Isaac also sent Biden an electronic invoice for the service in the amount of $85.00.  Biden never picked up his laptop or paid the invoice, despite Mac Isaac's numerous requests to do so.

During the data-recovery process, Mac Isaac saw some of the laptop's data, including communications and images.  He claims that, at first, he "did not think anything of" the information he saw.[5]  In July 2019, however, after hearing about

---

[3] Biden does not admit that he ever visited The Mac Shop, nor does he admit that Mac Isaac ever possessed any particular laptop containing electronically stored data belonging to him.  *See* App. to Biden's Opening Br. at A91 (Countercl. ¶ 4 n.1).  In any event, the parties agree that Mac Isaac came into possession of data belonging to Biden in April 2019.

[4] App. to Politico LLC's Answering Br. at B42 (Second Am. Compl. ¶ 23); *id.* at B80 (Second Am. Compl. Ex. A, photo of repair authorization).

[5] *Id.* at B93 (Second Am. Compl. Ex. D, Mac Isaac's clarifying statement).  *See also id.* at B48 (Second Am. Compl. ¶ 52 n.7).

Biden's business dealings with Ukraine, Mac Isaac became "uncomfortable" with what he had seen and informed the Federal Bureau of Investigation ("FBI") about the laptop.[6] In December 2019, after receiving a federal grand jury subpoena, he turned over the original laptop and hard drive to the FBI. Before he parted ways with the original, though, he made an exact copy of the hard drive.

Several months later, after watching the hearings concerning the impeachment of then-President Donald J. Trump, Mac Isaac came to believe that the laptop contained information relevant to the hearing. And because the laptop data had not been mentioned during the impeachment hearings, Mac Isaac questioned whether President Trump even knew about it. This prompted him to contact Robert Costello in August 2020. Costello was an attorney for Rudolph Guiliani, the former New York City mayor, former presidential candidate, and in 2020, a supporter of President Trump. Mac Isaac, hoping that Guiliani would share the information with President Trump, provided Costello with a copy of the hard drive and the repair authorization. When Mac Isaac delivered these items to Costello, he asked Costello not to disclose his identity, claiming that he wanted to remain anonymous. It would appear that Costello did not honor this request, and Mac Isaac's anonymity was short-lived.

---

[6] *Id.* at B93 (Second Am. Compl. Ex. D, Mac Isaac's clarifying statement). *See also id.* at B48 (Second Am. Compl. ¶ 52 n.7).

B

Guiliani provided copies of the hard drive and repair authorization to the *New York Post*. The *New York Post* set to work on an article concerning the information contained on the hard drive and, having learned Mac Isaac's identity from Guliani, reached out to him. Mac Isaac, unaware of the details of the forthcoming article, verified various facts for the *New York Post*, including how he came to possess the data, that he turned the original laptop and hard drive over to the FBI, and that he had given a copy of the hard drive to Costello. Mac Isaac, having confirmed these pivotal details about the laptop, told the *New York Post* that he did not want to be identified in the article.

On October 14, 2020—less than three weeks before the presidential election—the *New York Post* broke the story on Biden's laptop, publishing an online article titled "Smoking-gun email reveals how Hunter Biden introduced Ukrainian businessman to VP dad."[7] The article summarized information obtained from "a massive trove of data recovered from a laptop computer" that had been dropped off at a repair shop in Delaware.[8] The article reported that the laptop contained emails between Biden and various Ukrainian officials, the contents of which suggested

---

[7] *See* Emma-Jo Morris & Gabrielle Fonrouge, *Smoking-gun email reveals how Hunter Biden introduced Ukrainian businessman to VP dad*, NY Post (Oct. 14, 2020, 5:00 AM) (updated version), https://nypost.com/2020/10/14/email-reveals-how-hunter-biden-introduced-ukrainian-biz-man-to-dad/ [hereinafter "*New York Post* article"].
[8] *Id.*

6

corrupt activity by former-Vice President Joseph Biden, then a candidate in the impending presidential election. In addition to summarizing the emails, the article stated that the laptop also contained a video of Biden "smoking crack while engaged in sexual acts with an unidentified woman, as well as numerous other sexually explicit images."[9]

Although the *New York Post* article did not mention Mac Isaac by name, it referred several times to the "owner" of the Delaware computer store where the laptop had been dropped off. For example, the article stated that "[t]he customer who brought in the water-damaged MacBook Pro for repair never paid for the service or retrieved it or a hard drive on which its contents were stored, *according to the shop owner*, who said he tried repeatedly to contact the client."[10] The article also stated that the "*shop's owner* alerted the feds to the[] existence" of the laptop and hard drive, "[b]ut before turning over the gear, *the shop owner says*, he made a copy of the hard drive and later gave it to former Mayor Rudy Giuliani's lawyer, Robert Costello."[11] And notably, the article as originally published online included a photo of the repair authorization, which identified The Mac Shop as the computer repair store in Delaware that had serviced the laptop.[12]

---

[9] *Id.*
[10] *Id.* (emphasis added).
[11] *Id.* (emphasis added).
[12] The online article was eventually updated to remove the photo of the repair authorization.

Based on the information from the *New York Post* article, media outlets were able to identify Mac Isaac as the shop owner who had serviced the laptop and given its data to Costello. The same day that the article was published—October 14— several journalists went to The Mac Shop to interview Mac Isaac. Among those journalists was a reporter for the *Daily Beast*. Mac Isaac claims that these reporters entered The Mac Shop uninvited and "accosted" him for nearly an hour about the *New York Post* article and his involvement in disclosing the contents of the laptop.[13] Later that day, the *Daily Beast* published an online article titled "Man Who Reportedly Gave Hunter's Laptop to Rudy Speaks Out in Bizarre Interview."[14] The *Daily Beast* article identified Mac Isaac by name as the shop owner who had given Biden's data to the FBI and Costello.

C

In the months following the publication of the *New York Post* article, the story about Biden's laptop garnered significant media attention. Of this media attention, five events are of particular interest in this appeal: (i) an article published by *Politico* on October 19, 2020; (ii) statements made by then-presidential candidate Joseph

---

[13] App. to Politico LLC's Answering Br. at B46 (Second. Am. Compl. ¶ 45 n.6).

[14] Erin Banco & Jordan Howell, *Man Who Reportedly Gave Hunter's Laptop to Rudy Speaks Out in Bizarre Interview*, Daily Beast (Oct. 14, 2020, 3:52 PM), https://www.thedailybeast.com/man-who-reportedly-gave-hunters-laptop-to-rudy-speaks-out-in-bizarre-interview/ [hereinafter "*Daily Beast* article"]. A recording of Mac Isaac's interview with reporters was supposedly published with the *Daily Beast* article but has since been removed from the online publication. At this Court's request, Mac Isaac provided a flash drive containing the audio recording of that interview.

8

Biden and his campaign committee in October 2020; (iii) a statement published by Mac Isaac's attorney on his behalf on October 29, 2020; (iv) a CBS interview of Biden broadcast in April 2021; and (v) a book Mac Isaac wrote about Biden's data, published in November 2022.  We review these events in turn next.

i

On October 19, 2020, *Politico* published an online article with the headline, "Hunter Biden story is Russian disinfo, dozens of former intel officials say."[15]  The sub-headline, which appeared directly below the headline, reported that "[m]ore than 50 former intelligence officials signed a letter casting doubt on the provenance of the New York Post story on the former vice president's son."[16]  The article accurately summarized a "Public Statement on the Hunter Biden Emails" signed by fifty former intelligence officers that had been released earlier that day.[17]  The *Politico* article also contained a hyperlink to the actual public statement itself.

In the public statement, the intelligence officers opined that, while "[they] do not know if the emails provided to the New York Post by President Trump's personal attorney Rudy Giuliani[] are genuine or not and that [they] do not have evidence of

[15] App. to Politico LLC's Answering Br. at B59 (Second Am. Compl. ¶ 103).  *See also* Natasha Bertrand, *Hunter Biden story is Russian disinfo, dozens of former intel officials say*, Politico (Oct. 19, 2020, 10:30 AM), https://www.politico.com/news/2020/10/19/hunter-biden-story-russian-disinfo-430276. [hereinafter "*Politico* article"].

[16] App. to Politico LLC's Answering Br. at B59 (Second Am. Compl. ¶ 103).

[17] *Id.* at B101–108 (Second Am. Compl. Ex. F, intelligence officers' public statement).  *See also Public Statement on the Hunter Biden Emails* (Oct. 14, 2020), https://www.politico.com/f/?id=00000175-4393-d7aa-af77-579f9b330000.

Russian involvement," "[their] experience makes [them] deeply suspicious that the Russian government played a significant role" in the laptop story.[18] The officers suggested further that this story "has all the classic earmarks of a Russian information operation" and that, "if [they] are right, this is Russia trying to influence how Americans vote in this election, and [they] believe strongly that Americans need to be aware of this."[19]

ii

In October 2020, affiliates of Biden for President Campaign Committee, Inc. ("BFPCC" or the "Biden Campaign") made various public statements about the laptop story.[20] On October 14, 2020—the day the *New York Post* broke the story—*Politico* published an article quoting an unnamed Biden campaign official, who stated that the laptop story "is a Russian disinformation operation."[21] Additionally, two campaign employees and then-presidential candidate Joseph Biden himself

---

[18] App. to Politico LLC's Answering Br. at B102 (Second Am. Compl. Ex. F, intelligence officers' public statement).

[19] *Id.* (emphasis in original omitted).

[20] BFPCC is a Delaware corporation formed to operate as the presidential campaign for former-President Joseph Biden.

[21] App. to Politico LLC's Answering Br. at B65 (Second Am. Compl. ¶ 136); Kyle Cheney & Natasha Bertrand, *Biden Campaign Lashes Out at New York Post*, Politico (Oct. 14, 2020, 5:43 PM, updated Oct. 14, 2020, 8:29 PM), https://www.politico.com/news/2020/10/14/biden-campaign-lashes-out-new-york-post-429486.

made similar public statements in late October 2020 about the laptop story being the product of Russian disinformation.[22]

### iii

Mac Isaac's attorney, Brian Della Rocca, "in an attempt to clear things up with the American public,"[23] drafted a statement on Mac Isaac's behalf. This statement, which Mac Isaac refers to in his complaint as his "clarifying statement[,]"[24] went into greater detail about Mac Isaac's involvement in the release of Biden's data and essentially told Mac Isaac's side of the story. Della Rocca approached several media outlets, including the *Wall Street Journal* and the *Washington Post*, about publishing Mac Isaac's clarifying statement. The *Wall Street Journal* did not respond to Della Rocca, and the *Washington Post* told Della Rocca that the statement would not be a "good fit" for its paper.[25] On October 29,

---

[22] It is unclear when precisely the campaign employees or then-candidate Jospeh Biden made these statements. In any event, Mac Isaac and the Biden Campaign, in their briefing below, agreed that the statements were all made between October 14, 2020, and October 25, 2020. *See* Def. BFPCC's Opening Br. in Supp. of Mot. to Dismiss Pl.'s Second Am. Compl., *Mac Isaac v. Cable News Network, Inc.*, S22C-10-012, at 12 (Feb. 14, 2024) (Dkt. 184); Plaintiff John Paul Mac Isaac's Answering Br. in Opp'n to Def. BFPCC, Inc.'s Mot. to Dismiss, *Mac Isaac v. Cable News Network, Inc.*, S22C-10-012, at 15 (Mar. 27, 2024) (Dkt. 190).

[23] App. to Politico LLC's Answering Br. at B100 (Second Am. Compl. Ex. E, Della Rocca's email correspondence with the *Washington Post*). *See also id.* at B92–96 (Second Am. Compl. Ex. D, Mac Isaac's clarifying statement).

[24] *Id.* at B48 (Second Am. Compl. ¶ 52). In the second amended complaint, Mac Isaac adopts the clarifying statement, which was written on his behalf by Della Rocca, as his own. *See id.* (Second Am. Compl. ¶ 52) (". . . Plaintiff's clarifying statement was finally published by justthenews.com for all to read.").

[25] *Id.* at B98 (Second Am. Compl. Ex. E, Della Rocca's email correspondence with the *Washington Post*).

2020, Mac Isaac's "clarifying statement" was finally published online by *Just the News*.[26]

iv

On April 4, 2021—almost six months after the *New York Post* article was published—Biden appeared for a television interview on CBS about his recently published memoir. The interview, conducted by Tracy Smith, covered a variety of topics and, at one point, briefly addressed the laptop story:

> **Smith** (in narration): In October 2020, a New York Post article said that emails purportedly showing shady dealings in Ukraine by Hunter Biden were found on a laptop computer that he supposedly left in a Delaware repair shop in 2019. The details were sketchy at best. Last month, a declassified intelligence report said that before the election the Russians had launched a smear campaign against Joe Biden and his family.
> **Smith** (to Biden): It does not specifically talk about your laptop. Was that your laptop?
> **Biden**: For real, I don't know. . . I really don't know what the answer is. That's the truthful answer.
> **Smith**: Okay. You don't know yes or no if the laptop was yours?
> **Biden**: I don't have any idea. I've no idea whether or not.
> **Smith**: So it could have been yours?
> **Biden**: *Of course, certainly. There could be a laptop out there that was stolen from me. There could be that I was hacked. It could be that it was Russian intelligence. It could be that it was stolen from me, the laptop.*
> **Smith**: And so you didn't drop off a laptop to be repaired in Delaware*?*
> **Biden**: No. No.
> **Smith**: No.

---

[26] *Id.* at B48 (Second Am. Compl. ¶ 52). *See also* John Solomon, *Lawyer for Delaware shop owner: FBI initially turned down the purported Hunter Biden laptop*, Just the News (Oct. 29, 2020, 9:46 PM, updated Oct. 30, 2020, 3:40 PM) https://justthenews.com/accountability/russia-and-ukraine-scandals/lawyer-delaware-shop-owner-fbi-initially-turned-down#article.

12

**Biden**: Not that I remember at all . . . .[27]

v

On November 22, 2022—more than two years after the *New York Post* article was posted online—Mac Isaac published a book titled *American Injustice: My Battle to Expose the Truth*. In his book, Mac Isaac goes into greater detail about the role he played in in the public disclosure of Biden's data. He recounts how and when he searched Biden's laptop, created copies of the data he recovered, and disseminated these copies to various people. The book also provides more information about the content of Biden's laptop, describing files, photos, and videos of Biden's income statements, drug habits, and sexual activities.

In addition to publishing his book, Mac Isaac made several public appearances throughout 2022 and 2023. In May 2022, during a podcast interview with Fox News's Will Cain, Mac Isaac stated that the laptop contained "homemade pornography[,]" as well as videos of Biden "smoking crack and engaged in sex trade."[28] That same month, he also sold thumb drives of Biden's data at a campaign rally for then-U.S. Senate Republican candidate Jackson Lahmeyer. In July 2022, during an interview with media site *Real America's Voice*, Mac Isaac said that he

---

[27] App. to Biden's Answering Br. at B16–18 (Transcript of CBS Interview) (emphasis added) (formatting altered for clarity). *See also* Biden's Answering Br. at 6–7.
[28] App. to Biden's Opening Br. at A109 (Countercl. ¶ 55).

"saw a lot of inappropriate behavior [involving Biden] with family members" on the laptop.[29] And in April 2023, Mac Isaac appeared alongside Guiliani to accept an honor at a Republican fundraiser, where he was introduced as the "Hunter Biden Laptop Repairman."[30]

D

On October 17, 2022, Mac Isaac sued Adam Schiff,[31] Cable News Network, Inc. ("CNN"),[32] Politico LLC,[33] and Biden in the Superior Court individually for defamation and defamation *per se*, as well as collectively for civil conspiracy to commit defamation and for aiding and abetting defamation. Although Mac Isaac stated specific counts against the Biden Campaign for defamation and defamation *per se* in the body of his complaint, he did not name the Biden Campaign as a defendant in the case caption.[34] Nor did he file a praecipe directing the Prothonotary to issue a summons for service on the Biden Campaign when he filed the original complaint.[35] Recognizing this deficiency in his initial filing, Mac Isaac filed an

---

[29] *Id.* (Countercl. ¶ 54).

[30] *Id*. (Countercl. ¶ 54).

[31] Adam Schiff is a United States Senator from California who made several statements on CNN broadcasts about Russia's alleged involvement in the laptop story. He is not a party to this appeal.

[32] CNN is not a party to this appeal. We have therefore omitted facts pertaining to Mac Isaac's claims against CNN in the Superior Court.

[33] When referring to Politico as a company, the name is unitalicized. When referring to *Politico* as a publication, the name is italicized.

[34] *See* App. to BFPCC, Inc.'s Answering Br. at B1–43 (Mac Isaac's original complaint).

[35] *See* Praecipe, *Mac Isaac v. Cable News Network, Inc.*, S22C-10-012, at 12 (Oct. 17, 2022) (Dkt. 2) (Praecipe filed with original complaint requesting the issue of summons for service on CNN, Schiff, Politico, and Biden).

amended complaint on January 20, 2023, naming the Biden Campaign as a defendant. A few days later, on January 23, 2023, he filed a praecipe directing the Prothonotary to issue a summons for service on the Biden Campaign.[36]

The United States, acting under 28 U.S.C § 2679(d)(2), removed the case to the United States District Court for the District of Delaware on March 7, 2023.[37] The United States then moved to substitute itself as a defendant for Schiff under the Federal Tort Claims Act and moved to dismiss for lack of subject matter jurisdiction. The federal court, finding that Mac Isaac had failed to first present an administrative claim to the relevant federal agency, dismissed the claims against the United States, leaving only Mac Isaac's state-law claims against the remaining defendants. So the court, now lacking subject matter jurisdiction, remanded the case back to the Superior Court for further proceedings.

Back once more in the Superior Court, Mac Isaac filed his second amended complaint on August 2, 2023, alleging defamation, defamation *per se*, aiding and abetting, and conspiracy against Biden, Politico, the Biden Campaign, and CNN. Politico, the Biden Campaign, and CNN all moved to dismiss the second amended complaint under Superior Court Civil Rule 12(b)(6). Unlike the other three

---

[36] *See* Praecipe, *Mac Isaac v. Cable News Network, Inc.*, S22C-10-012, at 12 (Jan 23, 2023) (Dkt. 28) (Praecipe filed after first amended complaint requesting issue of summons on the original defendants and the Biden Campaign).
[37] *See Isaac v. Cable News Network, Inc.*, 2023 WL 2631497 (D. Del. Mar. 24, 2023).

defendants, after conducting limited discovery, Biden moved for summary judgment under Superior Court Civil Rule 56.

On March 17, 2023, when the case was in federal court, Biden lodged counterclaims against Mac Isaac. After the case was remanded to the Superior Court and Mac Isaac filed his second amended complaint, Biden answered and brought six counterclaims against Mac Isaac on August 8, 2023: (1) invasion of privacy by intrusion; (2) invasion of privacy by publication of private facts/matters; (3) conspiracy to invade privacy by intrusion; (4) conspiracy to invade privacy by publication of private facts/matters; (5) aiding and abetting an invasion of privacy by intrusion; and (6) aiding and abetting an invasion of privacy by publication of private facts/matters. Mac Isaac moved to dismiss Biden's counterclaims under Superior Court Civil Rule 12(b)(6).

E

After briefing and oral argument, the Superior Court granted Politico's, the Biden Campaign's, and CNN's motions to dismiss, as well as Biden's motion for summary judgment.[38] Because Mac Isaac's defamation claims against each of the defendants failed, the court dismissed Mac Isaac's claims for civil conspiracy to commit defamation and for aiding and abetting defamation against the defendants.

---

[38] *See Mac Isaac v. Cable News Network, Inc.,* 2024 WL 4371035 (Del. Super. Ct. Sept. 30, 2024) [hereinafter "Opinion"].

16

The court also granted Mac Isaac's motion to dismiss Biden's counterclaims. We address the trial court's reasoning below in our separate discussion of each party's claims on appeal.

Mac Isaac now appeals the Superior Court's dismissal of his claims against Politico and the Biden Campaign, as well as the court's grant of summary judgment in favor of Biden. Biden cross-appeals the court's dismissal of his counterclaims against Mac Isaac.

## II

Whether a statement is defamatory is a question of law that we review *de novo*.[39] Likewise, whether the statute of limitations bars a claim is a question of law subject to *de novo* review.[40]

We review the court's grant of a motion to dismiss *de novo*.[41] When analyzing a motion to dismiss under Superior Court Civil Rule 12(b)(6), we "must accept as true all well-pleaded allegations of fact."[42] We are not required, however, to accept "conclusory allegations without supporting factual allegations."[43] Moreover, we are only required to accept "reasonable inferences that logically flow from the face of the complaint[,]" and we need not accept "every strained interpretation of the

---

[39] *Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005).
[40] *Lehman Bros. Hldgs., Inc. v. Kee*, 268 A.3d 178, 185 (Del. 2021).
[41] *LGM Hldgs., LLC v. Schurder*, --- A.3d ---, 2025 WL 1162999, at *6 (Del. Apr. 22, 2025).
[42] *Page v. Oath Inc.*, 270 A.3d 833, 842 (Del. 2022) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).
[43] *Id.* (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65–66 (Del. 1995)).

allegations proposed by the plaintiff."[44] We will not affirm the court's dismissal of a claim "unless the plaintiff would not be entitled to recovery under any reasonably conceivable set of circumstances."[45]

We also review the court's grant of summary judgment *de novo*.[46] Under Superior Court Civil Rule 56, the party moving for summary judgment must show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[47] "If the moving party makes this showing, the burden shifts to the non-moving party to prove the existence of a genuine issue of material fact."[48] We "review[] the record, 'including any reasonable inference to be drawn therefrom,' in the light most favorable to the non-moving party."[49]

III

All three of Mac Isaac's claims center on what he contends were defamatory statements made about him by each of the three defendants in connection with the laptop story. A statement is defamatory if it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."[50] But not every defamatory statement is

---

[44] *Id.* (quoting *In re Gen. Motors (Hughes)*, 897 A.2d at 168).

[45] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[46] *Riad v. Brandywine Valley SPCA, Inc.*, 319 A.3d 878, 883 (Del. 2024).

[47] Del. Super. Ct. Civ. R. 56(c).

[48] *Droz v. Hennessy Indus., LLC*, 275 A.3d 257, 261 (Del. 2022).

[49] *Id.* at 262 (quoting *Stayton v. Clariant Corp.*, 2014 WL 28726, *1 (Del. Jan. 2, 2014) (TABLE)).

[50] *Cousins v. Goodier*, 283 A.3d 1140, 1148 (Del. 2022) (quoting Restatement of Torts § 559 (Am. Law Inst. 1938)).

actionable.[51]  To state a claim for defamation under Delaware law,[52] the plaintiff "must plead and ultimately prove that: 1) the defendant made a defamatory statement; 2) concerning the plaintiff; 3) the statement was published; and 4) a third party would understand the character of the communication as defamatory."[53]  If the plaintiff is a public figure, even for a limited purpose, then the plaintiff "must also plead and prove that 5) that statement is false and 6) that the defendant made the statement with actual malice."[54]

The second element of defamation—often referred to as the "of and concerning" element—requires "the plaintiff [to] show that the allegedly defamatory statement concerns the plaintiff."[55]  In most cases, this element "will be apparent from the face of the statement."[56]  A defamatory statement is "of and concerning" the plaintiff if a person who hears the statement "reasonably or correctly believe[s] that [the statement] was intended to refer to the plaintiff."[57]  In other words, there

---

[51] *Id.*

[52] Defamation comprises the "twin torts" of libel and slander. *Spence v. Funk*, 396 A.2d 967, 970 (Del. 1978).  Libel is written defamation, whereas slander is spoken defamation. *Id.*  Both torts consist of the same basic elements, but for the sake of completeness, we note that a claim for slander requires the plaintiff to allege either slander *per se* or proof of special damages. *Id.*  In this appeal it is not necessary to delve into the nuances of slander and libel because we need only examine the basic, shared elements of the two torts.

[53] *Page*, 270 A.3d at 842 (quoting *Cahill*, 884 A.2d at 463).

[54] *Id.* (quoting *Cahill*, 884 A.2d at 463) (brackets omitted).

[55] *Cahill*, 884 A.2d at 463.

[56] *Id.*

[57] Dan B. Dobbs et al., *The Law of Torts* § 527 (2d ed. 2025) (Apr. update) [hereinafter "Dobbs"]. *See also* Restatement (Second) of Torts § 564 (Am. Law Inst. 1977) (Oct. 2024 update) ("A defamatory communication is made concerning that person to whom a recipient correctly, or mistakenly but reasonably understands that it was intended to refer to.").

19

must be a reasonably discernible link between the allegedly defamatory statement and the plaintiff. Accordingly, a plaintiff must "plead and ultimately prove that the defendant made a statement *about* the plaintiff that would be understood as defamatory by *a reasonable third party*."[58] Whether a statement is capable of bearing a particular meaning—including whether it is capable of being reasonably understood as concerning the plaintiff—is a question of law within the court's purview to decide at the motion to dismiss and summary judgment stages.[59]

With this framework in mind, we address Mac Isaac's claims against each defendant in turn, beginning with his claim against Politico.

A

In the Superior Court, Mac Isaac conceded that the October 19 *Politico* article was "substantially true," but argued that its headline, which stated that the "Hunter Biden story *IS* Russian disinformation," was false and defamatory.[60] This

---

[58] *Cousins*, 283 A.3d at 1148.

[59] *See Slawik v. News-Journal Co.*, 428 A.2d 15, 17 (Del. 1981) (quoting Restatement (Second) of Torts § 614 cmt. b (Am. Law Inst. 1977) ("The court determines whether the communication is capable of bearing the meaning ascribed to it by the plaintiff and whether the meaning so ascribed is defamatory in character. If the court decides against the plaintiff upon either of these questions, there is no further question for the jury to determine and the case is ended."). *See also Cousins*, 283 A.3d at 1147 ("Whether a challenged statement can reasonably be interpreted as communicating actionable defamatory facts about an individual is a question of law."); Rodeny A. Smolla, 1 Law of Defamation § 4:38 (2d ed.) (May 2025 update) ("The judge determines in the first instance whether a statement is capable of sustaining a defamatory meaning.").

[60] App. to Politico LLC's Answering Br. at B216 (emphasis in original). Our dissenting colleague attributes the statement that the October 19 *Politico* article was "substantially true" to our opinion here. But as this citation and the above text makes clear, we attribute the statement to Mac Isaac himself.

decoupling of the headline from the substance of the article was consistent with Mac Isaac's complaint, in which he highlighted that "[s]tudies have shown that many readers browse headlines and do not read the actual underlying article."[61] The Superior Court rejected this argument and concluded that the *Politico* headline was not defamatory. The court noted that the headline did not mention Mac Isaac and that the sub-headline, which accurately conveyed that the intelligence officers' letter had merely "cast[] doubt on the provenance of [the] New York Post story," appropriately clarified the headline.[62] The court also concluded that, "even if the [headline] w[as] defamatory or concerned Mac Isaac, he is a limited purpose public figure and he had not adequately pled actual malice," which constituted an additional ground for dismissal.[63] We agree with the court as to the first point and, in consequence, need not address the second.[64]

For starters, the article's headline, which is the only part of the publication identified by Mac Isaac as false and defamatory, does not mention Mac Isaac or provide any information from which a reader might think that Mac Isaac was a participant in a "Russian information operation."[65] And the only statement in the

---

[61] *Id.* at B59.

[62] Opinion, 2024 WL 4371035, at *5 (quoting *Politico* article).

[63] *Id.*

[64] We note that our dissenting colleague devotes a considerable portion of her dissenting opinion to the limited-purpose public figure issue. Given our determination that the *Politico* headline did not defame Mac Isaac, we see no need to address that issue in our majority opinion.

[65] *Politico* article.

21

article below the headline "of and concerning" Mac Isaac was that he initiated the chain of events that led to the laptop landing in the hands of Rudy Guiliani. That statement was true, and Mac Isaac concedes as much. The Superior Court, to be sure, was required to view Mac Isaac's complaint through a plaintiff-friendly lens. But the court's duty to draw all reasonable inferences in Mac Isaac's favor when it assessed the adequacy of his pleadings does not require the trial court—or this Court—to accept conclusory allegations as true. No matter how often Mac Isaac claims that the *Politico* headline "implicated him as being part of a Russian disinformation operation," the text of the headline is not reasonably read in that fashion.[66] To the extent that the headline and the article together concerned Mac Isaac at all, it did so in an accurate and nondefamatory way.

---

[66] Mac Isaac's Opening Br. at 24. Our dissenting colleague concludes that allegations concerning earlier publications in the operative complaint "support a reasonable inference that someone following the presidential election and the Hunter Biden laptop story, which was widely reported upon as soon as the story broke, would know that Mac Isaac was the source of the laptop." We note preliminarily that Mac Isaac did not frame his argument in this Court in that way. Instead, in his remarkably short treatment of the *Politico* article in his opening brief, Mac Isaac cabined his argument to the *Politico* headline itself and only begrudgingly acknowledged that the body of the Politico article was relevant. He argued: "Plaintiff was damaged by the headline that was published which, as argued throughout the proceedings, implicated him as being part of a Russian disinformation operation. He is referenced in the article but the article itself, while accurate, is tainted by its headline." Mac Isaac's Opening Br. at 24. The first sentence is plainly incorrect; the headline itself did not implicate Mac Isaac at all. More relevant, however, is whether a reasonable reader who might have identified Mac Isaac as the source of the *laptop* could reasonably conclude that he was the author of the *Russian disinformation*. That is the inference we in the majority are not prepared to draw. In our view, it is no more likely that a laptop-repair shop owner is the originator of data found on laptops entrusted to his care than it is that a used-book-store owner is the author of the text in the books on his shelves.

We grant that the headline could be read to mean that the former intelligence officials had concluded that the "Hunter Biden story" was in fact Russian disinformation, which they had not so concluded. But a false statement is not defamatory when it does not concern the plaintiff. For the headline to prompt a reader to connect Mac Isaac to the putatively false statement, the reader would have to consult the body of the article, which contains the admittedly accurate statement that "Rudy Guiliani . . . said he got [the laptop] from a Mac shop owner in Delaware who also alerted the FBI."[67]

Herein lies the fatal inconsistency in Mac Isaac's argument: He has argued throughout this litigation that the headline must be read in isolation, and yet he concedes that the only way readers would know that the headline was "of and concerning" him is if they read the article below, which makes a passing reference to a "Mac shop owner in Delaware who also alerted the FBI."[68] What his argument fails to account for, however, is that to find the reference to Mac Isaac, a reader must delve into the article below, which accurately reports the facts and provides non-defamatory context for the headline.

Under Delaware common law, truth—including substantial truth—is an affirmative defense to defamation.[69] When considering whether a statement is

---

[67] *Politico* article.
[68] *Id.*
[69] *Page*, 270 A.3d at 843 (citing *Barker v. Huang*, 610 A.2d 134, 1350 (Del. 1992)).

substantially true, we consider whether the "gist" or "sting" of the statement is true—that is, whether "it produces the same impression on the reader which the precise truth would have."[70] Here, Mac Isaac contends that the headline was inaccurate because it overstated the conclusion of the former intelligence officers. But the "gist" of the publication, which necessarily includes the article if the reader is to conclude that it is "of and concerning" Mac Isaac, is true; Mac Isaac concedes as much. Accordingly, the Superior Court's dismissal of Mac Isaac's defamation claim against Politico was proper, as was its dismissal of the aiding-and-abetting and conspiracy claims that were contingent on the underlying defamation claim.[71]

B

Mac Isaac's defamation claim against Biden suffers from the same fundamental flaw as his claims against Politico—the statements made by Biden during the CBS interview simply do not bear the defamatory meaning that Mac Isaac ascribes to them. Not surprisingly, the Superior Court granted Biden's motion for summary judgment for much the same reasons upon which it based its dismissal of Mac Isaac's claim against Politico. The court found that Biden's "statements cannot be understood as defamatory by a reasonable listener" because they "do not name or

---

[70] *Id.* (citing *Garnett Co., Inc. v. Re*, 496 A.2d 553, 557 (Del. 1985)).
[71] *Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391, at *10 (Del. Ch. July 20, 2010) ("Lacking an underlying wrong, [plaintiff's] claims against [defendant] for aiding and abetting and conspiracy likewise fail.").

24

reference Mac Isaac or his business directly or indirectly."[72]  And the court found that, even if Biden's statements could be construed by a reasonable person as defamatory, Mac Isaac's claim failed all the same because he was a limited purpose public figure, and "he cannot show that Biden's statement was malicious."[73]

As a threshold matter, there are no genuine issues of material fact—nor has either party argued that any exist—that would preclude a court from deciding Mac Isaac's claim against Biden at the motion for summary judgment stage.  Although the parties disagree as to how Mac Isaac came to possess Biden's data,[74] the parties agree that, through whatever means, Mac Isaac came to possess data belonging to Biden in April 2019.  How Mac Isaac came to possess the data is not material to the court's analysis of whether Biden's statements during the interview were defamatory.

The statements Biden made in the interview are transcribed above in full.  To summarize, upon questioning that included a brief description of the *New York Post* article, Biden expressed doubts concerning his ownership of the laptop.  But he also posited that the laptop might belong to him.  He then offered the possibilities that it was "stolen," "hacked," "or could be that it is Russian intelligence."[75]  He did not

---

[72] Opinion, 2024 WL 4371035, at *8.  As with Mac Isaac's claims against Politico, because we find that Biden's statements were not defamatory, we need not consider whether Mac Isaac is a limited purpose public figure.

[73] *Id.*

[74] *See supra* note 3.

[75] *See supra* pp. 12–13.

mention Mac Isaac, though in her questions, the interviewer mentioned that the *New York Post* article had reported that Biden had "left [it] in a Delaware repair shop in 2019."[76]

Mac Isaac now contends—as he did in the Superior Court—that, by answering the CBS interview questions as he did, Biden "imputed that [he] was involved in one or more crimes, including stealing [Biden's] laptop, hacking [Biden's] laptop, and being part of a plot by Russian intelligence."[77] Even though Biden does not mention him by name or otherwise in the interview, Mac Isaac claims that these statements are nonetheless "of and concerning" him. He contends that, by the time Biden gave the interview in April 2021, he had "become so intertwined with the Hunter Biden laptop story" that a reasonable person could conclude that the statements were "of and concerning" him.[78] We disagree.

To say that Biden's statements were "of and concerning" Mac Isaac is, to be charitable, a stretch. As with the *Politico* article, Mac Isaac was not mentioned during the CBS interview. And once again he fails to explain why a viewer would understand from Biden's comments that he was the malefactor who possibly stole or hacked the laptop or that he was complicit in a Russian disinformation scheme. Biden did not mention Mac Isaac by name nor did he point an implicitly accusatory

---

[76] *Id.*
[77] Mac Isaac's Opening Br. at 19–20.
[78] *Id.* at 20.

finger at him. To the extent that viewers might understand that he was the owner of the laptop-repair shop mentioned by the interviewer, Mac Isaac was merely introduced as a bit player in a larger story. We are not inclined to elevate him to a leading role. We see no error in the Superior Court's dismissal of Mac Isaac's claims against Biden—including the aiding-and-abetting and conspiracy claims, which are dependent upon the viability of the defamation claim.[79]

C

The court's dismissal of Mac Isaac's claim against the Biden Campaign was three-fold. First, because Mac Isaac's amended complaint and amended praecipe were filed in January 2023—more than two years after the last allegedly defamatory statement attributed to the Biden Campaign—the court determined that the claim was time barred under 10 *Del. C.* § 8119.[80] Mac Isaac argued below that, under Superior Court Civil Rule 15(c), the first amended complaint related back to the original complaint. And under the relation-back doctrine, Mac Isaac insisted that his claim against the Biden Campaign was timely. The court disagreed, finding that

---

[79] *Airborne Health*, 2010 WL 2836391, at *10.

[80] As mentioned above, Mac Isaac filed his initial complaint on October 17, 2022. Although the body of the complaint made a claim against the Biden Campaign, it was not named as a defendant in the case caption. Nor did Mac Isaac file a praecipe directing the Prothonotary to issue a summons for service on the Biden Campaign as required under Superior Court Civil Rule 3(a). Under Rule 3(a), "an action is commenced by filing with the Prothonotary a complaint . . . and a praecipe directing the Prothonotary to issue the writ specified therein." When Mac Isaac amended his complaint in January 2023, he filed an amended praecipe, for the first time directing the Prothonotary to issue a summons for service on the Biden Campaign. *See supra* nn.35–36.

Mac Isaac could not demonstrate that the Biden Campaign "knew or should have known of his clerical error," as required under the third prong of Rule 15(c).[81] Second, the court ruled that, like the statements attributed to the other defendants, the Biden Campaign's statements "are not defamatory and are not about Mac Isaac."[82] And third, the court determined that Mac Isaac was a limited purpose public figure and had not shown actual malice as would be required given that status. It was on these three separate and independent grounds that the Superior Court dismissed Mac Isaac's claim against the Biden Campaign.

On appeal, Mac Isaac has failed to address two bases for the court's holding. Although Mac Isaac argued in his opening brief in this appeal that the Superior Court incorrectly concluded that he was a limited purpose public figure, his opening brief is devoid of any argument as to how the court's other two reasons for dismissal were erroneous. The opening brief's argument section addressing the Superior Court's conclusion that the defendants' various statements were not defamatory because they did not concern Mac Isaac is devoted entirely to statements attributed to Biden; no mention is made there of the Biden Campaign's statements. What is even more striking is the utter absence of any discussion anywhere in Mac Isaac's opening brief

---

[81] Opinion, 2024 WL 4371035, at *6.
[82] *Id.*

28

of the court's conclusion that the claim against the Biden Campaign was subject to dismissal under the relevant statute of limitations.[83]

This deficiency runs afoul of this Court's rules, which provide that "[t]he merits of any argument that is not raised in the body of the opening brief shall be deemed waived and will not be considered by the Court on appeal."[84] In all candor, we cannot conceive of a waiver more obvious than we discern here.[85] And the practical effect of the waiver is that two independent grounds for the Superior Court's dismissal of Mac Isaac's claim against the Biden Campaign have gone unchallenged. Hence, we affirm the court's dismissal of that claim.

IV

On cross-appeal, Biden challenges the Superior Court's dismissal of his invasion-of-privacy counterclaims as barred by 10 *Del. C.* § 8119's two-year statute of limitations. In Biden's opposition to Mac Isaac's motion to dismiss in the

---

[83] Neither the applicable statute of limitations (10 *Del. C.* § 8119) nor the relation-back rule that Mac Isaac sought to rely upon below (Superior Court Civil Rule 15(c)) are cited in Mac Isaac's opening brief.

[84] Del. Supr. Ct. R. 14(b)(iv)(A)(3).

[85] In his reply brief, Mac Isaac finally addresses the Superior Court's holding that his defamation claim against the Biden Campaign was barred by the statute of limitations. *See* Mac Isaac's Reply Br. at 4. He fails to address, however, the argument raised by the Biden Campaign in its answering brief that Mac Isaac waived any challenge to the court's dismissal by failing to address it in his opening brief. *See* BFPCC, Inc.'s Answering Br. at 5–6. Instead, Mac Isaac merely states—without citations—that "[t]he opening brief comprehensively addressed the key issues, including the defamatory nature of the statements and the misclassification of [him] as a limited purpose public figure." Mac Isaac's Reply Br. at 5. Tellingly, Mac Isaac does not even attempt to argue in his reply brief that his opening brief addressed the court's holding that his claim against the Biden Campaign was time-barred.

29

Superior Court, he argued that the statute of limitations was tolled because he could not have known the extent to which Mac Isaac handled his private data until Mac Isaac published his book in November 2022. Biden also argued that, because Mac Isaac continues to publish and republish private facts about him, his invasion-of-privacy-by-publication-claim was tolled. The court rejected these arguments, finding, first, that "[t]he statute of limitations is not tolled when a defendant continues to publish and republish[.]"[86] Second, the court noted that Biden "was on notice that his data on his laptop had been compromised and disseminated" when the *New York Post* article was published.[87]

Biden challenges the court's dismissal on two grounds. First, he argues that the court erred in concluding that the two-year statute of limitations on all six of his counterclaims began running on October 14, 2020—the day the *New York Post* article was published. According to Biden, the two-year statute of limitations was tolled under Delaware's "time-of-discovery" rule until Mac Isaac published his book in November 2022. Additionally, Biden argues that the court erred in failing to separately analyze his claim for invasion of privacy by publication. Biden contends that, even if the statute of limitations began running on October 14, 2020, on his invasion-of-privacy-by-intrusion claim, the statute of limitations on his-invasion-of-

---

[86] Opinion, 2024 WL 4371035, at *7.
[87] *Id.*

30

privacy-by-publication claim did not begin to run until Mac Isaac published his book. We agree that the court should have conducted two separate analyses—one for the invasion-of-privacy-by-intrusion claim and another for the invasion-of-privacy-by-publication claim. We address each claim below and conclude that the court did not err in dismissing Biden's counterclaims.

A

Delaware law recognizes four variations of the common law tort of invasion of privacy.[88] Biden invokes the first and second variations of the tort: invasion of privacy by intrusion[89] and invasion of privacy by publication.[90] A defendant is liable for invasion of privacy by intrusion when the defendant "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns [and] the intrusion would be highly offensive to a reasonable person."[91] By contrast, a defendant is liable for invasion of privacy by publication

---

[88] The four variations are "(1) intrusion on plaintiff's physical solitude; (2) publication of private matters violating the ordinary senses; (3) putting plaintiff in a false position in the public eye; and (4) appropriation of some element of plaintiff's personality for commercial use." *Barker*, 610 A.2d at 1349.

[89] Although Biden refers to the tort as "invasion of privacy by intrusion" we note that the tort is also referred to as "intrusion upon seclusion." *See* Restatement (Second) of Torts § 652(B) (Am. Law Inst. 1977) (Oct. 2024 update).

[90] Although Biden refers to this tort as "invasion of privacy by publication," we note that the tort is also referred to as "publicity given to private life" or "publicizing private life." *See* Restatement (Second) of Torts § 652(D) (Am. Law Inst. 1977) (Oct. 2024 update); Dobbs § 581.

[91] *Barker*, 610 A.2d at 1349 (quoting Restatement (Second) of Torts § 652(B) (Am. Law Inst. 1977)).

31

when the defendant "gives publicity to a matter concerning the private life of another" and the information publicized "would be highly offense to a reasonable person" and "is not of a legitimate concern to the public."[92]  "Publicity" in this context means that "the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."[93]

B

Under 10 *Del. C.* § 8119, "[n]o action for the recovery of damages upon a claim for alleged personal injuries shall be brought after the expiration of 2 years from the date upon which it is claimed that such alleged injuries were sustained." The parties agree that Biden's invasion-of-privacy claims are governed by this section.

In Delaware, a cause of action "accrues" for statute of limitations purposes "at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."[94] For tort claims, the wrongful act occurs at the time of injury, meaning that "[a] cause of action in tort accrues at the moment when an injury, although slight, is sustained

---

[92] *Id.* (quoting Restatement (Second) of Torts § 652(D) (Am. Law Inst. 1977)).
[93] Restatement § 652(D) cmt. a.  Publicity differs somewhat from the term "publication" used in connection with liability for defamation.  Publication "in that sense, is a word of, which includes any communication by the defendant to a third person."  *Id.*  The difference between these terms "is not one of the means of communication, which may be oral, written, or by any other means." *Id.*  Rather, "[i]t is one of communication that reaches, or is sure to reach the public." *Id.*
[94] *ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 732–33 (Del. 2020).

in consequence of the wrongful act of another."[95]  This means that a claim for invasion of privacy by intrusion accrues when the defendant *intrudes* upon the plaintiff's private affairs, while a claim for invasion of privacy by publication accrues when the defendant *publicizes* private information about the plaintiff.

The statute of limitations may be tolled after a cause of action accrues, however, under "certain narrow circumstances."[96]  One such circumstance is when the plaintiff's injury is "inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and injury complained of."[97]  If these two criteria are met, the statute is tolled until "the discovery of facts 'constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on notice of inquiry which, if pursued, would lead to the discovery' of such facts."[98]  In short, when the plaintiff's injury is "inherently unknowable" and the plaintiff is "blamelessly ignorant," the time-of-discovery rule will toll the statute of limitations until the plaintiff is on inquiry notice of the claim.

---

[95] *Id.* (quoting *Kaufman v. C.L. McCabe & Sons, Inc.*, 603 A.2d 831, 834 (Del. 1992)).

[96] *Saunders v. Lightwave Logic, Inc.*, --- A.3d ---, 2025 WL 1793978 (Del. June 30, 2025).

[97] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).  The "time-of-discovery" rule was traditionally applied to claims for medical malpractice but has since been expanded to apply other personal injury actions.  *See Altenbaugh v. Benchmark Builders, Inc.*, 271 A.3d 188, 2022 WL 176292, at *2 (Del. Jan. 20, 2022) (TABLE) (discussing *Layton v. Allen*, 246 A.2d 794 (Del. 1968)).

[98] *Wal-Mart*, 860 A.2d at 319 (quoting *Coleman v. PricewaterhouseCoopers, LLC*, 854 A.2d 838, 842 (Del. 2004)).  *See also Morton v. Sky Nails*, 884 A.2d 480, 841 (Del. 2005) ("Under the time of discovery rule, the statute of limitations does not begin to run until a party knows or has reason to know that he/she has been injured.").

Importantly, the statute of limitations will not be tolled if the plaintiff could have discovered facts giving rise to the claim through the exercise of due diligence.[99]

C

The court correctly concluded that Biden's invasion-of-privacy-by-intrusion-counterclaim was barred by the statute of limitations. The claim accrued the moment Mac Isaac began parsing through Biden's personal data, some of which was of a highly sensitive nature. As mentioned above, Biden denies ever visiting The Mac Shop and leaving a laptop with Mac Isaac.[100] Assuming for the purpose of the cross-appeal that that is true, Biden was blamelessly ignorant that Mac Isaac possessed data belonging to him and his injury was inherently unknowable until October 14, 2020, when the *New York Post* article was published. At that point, Biden was indisputably on inquiry notice that his personal data—through whatever means—had been compromised. Although the *New York Post* article did not mention Mac Isaac by name, it gave sufficient details for Biden to identify Mac Isaac as the person who had intruded into his private data. In addition, the *Daily Beast* article, published that same day, identified Mac Isaac by name as the person who had given his data to Giuliani. Given these facts, the Superior Court did not err in finding that Biden

---

[99] *See Shockley v. Dyer*, 456 A.2d 798, 799–800 (Del. 1983) (finding that the statute of limitations was not tolled under the doctrine of fraudulent concealment because "the plaintiff could have discovered her rights by exercising due diligence . . . .").
[100] *See supra* note 3.

was on inquiry notice of his invasion-of-privacy-by-intrusion claim on October 14, 2020.

Biden's argument that the statute of limitations on his invasion-of-privacy-by-intrusion claim was tolled until Mac Isaac's book was published is unavailing. That the book may have provided more detail about the extent to which Mac Isaac intruded upon Biden's private life does not alter the fact that Biden was put on inquiry notice of this claim on October 14, 2020. "Inquiry notice does not require full knowledge of the material facts."[101] Rather, "plaintiffs are on inquiry notice when they have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence would commence an investigation that, if pursued would lead to the discovery of the injury."[102] The *New York Post* and *Daily Beast* articles contained facts sufficient to raise Biden's suspicions and put him on notice that Mac Isaac had intruded upon his private life. Thus, to avoid § 8119's time bar, Biden's invasion-of-privacy-by-intrusion claim should have been filed no later than October 13, 2022. Because Biden did not file his counterclaim until March 17, 2023, the court correctly dismissed his invasion-of-privacy-by-intrusion claim as time-barred. Consequently, the court also properly dismissed Biden's related aiding-and-abetting and conspiracy counterclaims.

---

[101] *Ont. Provincial Couns. of Carpenters' Pen. Tr. Fund v. Walton*, 294 A.3d 65, 96 (Del. Ch. 2023) (quoting *Pomeranz v. Museum P'rs, L.P.*, 2005 WL 217039, at \*3 (Del. Ch. Jan. 24, 2005)).
[102] *Id.* (quoting *Pomeranz*, 2005 WL 217039, at \*3).

D

Biden's invasion-of-privacy-by-publication claim requires a different analysis. In his answering brief to Mac Isaac's motion to dismiss below, Biden argued that "Mac Isaac's invasion of [] Biden's privacy through the publication has persisted, as Mac Isaac *continues* to publish and republish private facts about [] Biden in appearances and podcast interviews" and that "[t]hese publications and re-publications of private facts are abundant, and *toll* the relevant limitation period until, at the earliest, two years after Mac Isaac's latest-known appearance."[103] The court rejected this argument, stating that "[t]he statute of limitations is not tolled when the defendant continues to publish and republish."[104] The court concluded that Biden was on inquiry notice of his invasion-of-privacy-by-publication claim when the *New York Post* article was published and therefore his claim was time-barred.

On appeal, Biden now argues that his cause of action for invasion of privacy by publication accrued in November 2022, when Mac Isaac published his tell-all book. Biden claims that although "the statute of limitations for invasion of privacy by intrusion began when [] Biden knew (or should have discovered) Mac Isaac's *intrusion* into his private data, the statute of limitations for invasion by publication did not begin until [] Biden knew about (or could discover) the *publication* of the

---

[103] App. to Biden's Opening Br. at A173 (Biden's briefing below) (emphasis added).
[104] Opinion, 2024 WL 4371035, at *7.

facts thereof."[105]  According to Biden, Mac Isaac committed an invasion of privacy each time he made a new matter public and therefore "the Superior Court incorrectly concluded that the limitations period began to run *before* much of the information was even published—*i.e.*, before Mac Isaac's torts of invasion by publication had even been committed."[106]

Biden's invasion-of-privacy-by publication counterclaim is contained within a single count, the gist of which is that "Mac Isaac disclosed and disseminated [] Biden's private and confidential data . . . to various third parties and then wrote a book and made media appearances in which he disclosed and disseminated the data."[107]  Although he identifies the 2022 publication of Mac Isaac's book, he presents his claim as a continuous unitary tort that began when Mac Isaac first disseminated copies of the data to various people.  And when Mac Isaac invoked the two-year statute of limitations in his motion to dismiss in the Superior Court, Biden adhered to this continuous unitary tort theory.  Rather than treating Mac Isaac's publications and republications as a sequence of wrongful acts, each of which are subject to a separate limitations period, Biden argued that the acts were a continuing wrong of which he was blamelessly unaware until some indefinite time in the later part of 2022.

---

[105] Biden's Opening Br. at 18 (emphasis in original).
[106] *Id.* at 20.
[107] App. to Biden's Opening Br. at A114 (Countercl. ¶ 75).

Acknowledging that Mac Isaac "first accessed [] Biden's data in April 2019"—a fact of which Biden was indisputably aware as of October 2020—Biden invoked the "time of discovery" rule, contending that, because he was blamelessly unaware of the extent of Mac Isaac's invasion of his privacy, the relevant limitations period was tolled "until, at the earliest, two years after Mac Isaac's latest-known appearance in June 2022."[108] The Superior Court, in our view, correctly rejected this argument.

The statute of limitations is not tolled when a defendant publicizes the plaintiff's private information on numerous occasions.[109] Instead, each public disclosure of the plaintiff's private information can, under certain circumstances, give rise to a separate cause of action that accrues at the time of the disclosure.[110]

---

[108] *Id.* at A173 (Biden's answering brief in response to Mac Isaac's motion to dismiss in the Superior Court).

[109] *See also* J. Thomas McCarthy & Roger E. Schechter, *Rights of Publicity and Privacy* § 11:41 (2d ed. 2025 update) ("If defendant's acts consist of a continuing publication or use, then each infringing act gives rise to a new cause of action for purposes of the statute of limitations" and "[u]nder the single publication rule, a single issue or edition of a publication such as a newspaper or magazine gives rise to only one cause of action, which accrues on the date of first distribution to the public.") [hereinafter MacCarthy & Schecter, *Privacy*].

[110] *Id.* Because "the tort of invasion of privacy [] acts as a counterpart to the tort of defamation," we look to defamation law for further guidance. *Barker*, 610 A.2d at 1350. Under either the common law rule or the single-publication rule, when the defendant's publication of private or defamatory material is sufficiently different from previous publications, it gives rise to a new cause of action for invasion of privacy. *See* Dobbs § 573 (At common law, "each new communication, such as sale of a single copy of a book, [w]as a new publication" giving rise to a new cause of action); Restatement (Second) of Torts § 577A cmt. a (Am. L. Inst. 1977) ("It is the general rule that each communication of the same defamatory manner by the same defamer, whether to a new person or to the same person, is a separate and district publication, for which a separate cause of action arises); MacCarthy & Schecter, *Privacy* § 11:21 (Under the single-publication rule, "[p]ublications on different occasions may constate separate publications." For example, "[d]ifferent editions of a newspaper or magazine constitute separate publications and several

38

This is especially the case when a republication is designed to reach a new audience.[111] But that is not how Biden framed his invasion-of-privacy-by-publication counterclaim nor is it how he defended it against Mac Isaac's motion to dismiss.

Instead of arguing that these publications gave rise to separate causes of actions that accrued at different times, Biden argued below that they were continuous and therefore his claim should be tolled until the last time Mac Isaac publicly disclosed Biden's personal data, that is, until the wrongful conduct ceased. In a short section of his opening brief on appeal, bereft of any relevant authority, he now argues that "each time Mac Isaac made a new matter public, he committed an invasion by publication."[112] Biden did not, however, make this argument below. And under Delaware Supreme Court Rule 8, "[o]nly questions fairly presented to the trial court may be presented [to this Court] for review[.]" This rule does not, of course, foreclose review under a plain-error standard,[113] "when the interests of justice so

---

causes of action, as do publications in different periodicals or in different formats such as initially in print and thereafter on social media websites.").

[111] 62A Am. Jur. 2d *Privacy* § 148. ("Thus, where republication is intended to reach a new audience, such republication will refresh the limitation period for bringing an invasion of privacy claim."); 53 C.J.S. *Libel and Slander; Injurious Falsehood* § (2025 update) (The plaintiff is not limited to a single cause of action if the private or defamatory material is "republished in another, separate printing . . . .").

[112] Biden's Opening Br. at 19.

[113] *See Smith v. Del. State Univ.*, 47 A.3d 472, 479 (Del. 2012) (quoting *Turner v. State*, 5 A.3d 612, 615 (Del. 2010)) (noting that "this Court may excuse waiver if it finds that the trial court committed plain error requiring review in the interests of justice.").

39

require[.]"[114]   This exception to Rule 8 is "very narrow" and "extremely limited[,]"[115] reserved for instances where "the trial court made a plain error that had the effect of depriving [the appellant] of a substantial right or clearly shows a manifest injustice."[116]   Here, the belatedly framed argument was not fairly presented to the Superior Court and, even now, Biden's briefing of the issue in this Court is thin.   Under these circumstances, the interests of justice, in our view, do not require us to address the issue for the first time on appeal.

Given Biden's decision to pursue his invasion-of-privacy-by-publication counterclaim as a single continuous wrong, we agree with the Superior Court that Biden was on inquiry notice of his claim on October 14, 2020, when the *New York Post* article was published.   The *New York Post* reported that a computer repair shop owner in Delaware—identified by the *Daily Beast* later that day as Mac Isaac—had made a copy of Biden's private data and given it to Guiliani, who had in turn given it to the *New York Post*.   Therefore, Biden was on notice on October 14, 2020, that Mac Isaac had made private matters about him public by giving a copy of the hard drive to Guliani's lawyer and confirming details about the hard drive for the *New York Post*.   Thus, the court's dismissal of Biden's invasion-of-privacy-by-

---

[114] Del. Supr. Ct. R. 8.
[115] *Ravindran v. GLAS Tr. Co. LLC*, 327 A.3d 1061, 1078 (Del. 2024) (quoting *Russell v. State*, 5 A.3d 622, 627 (Del. 2010)).
[116] *Protech Mins., Inc. v. Dugout Team, LLC*, 284 A.3d 369, 379 (Del. 2022).

publication counterclaim, as well as the court's dismissal of the related aiding-and-abetting and conspiracy counterclaims, was not erroneous.

V

For the reasons stated, we affirm the Superior Court's order dismissing Mac Isaac's claims and Biden's counterclaims, as well as the court's grant of summary judgment in Biden's favor.

**VALIHURA, J.,** dissenting:

I join the Majority in all of its holdings except one: its affirmance of the Superior Court's dismissal of Mac Isaac's defamation claim against Politico on the grounds that the statement was not defamatory. I respectfully dissent from the Majority's holding because I believe that Mac Isaac's allegations that the Politico headline was defamatory met the liberal Rule 12(b)(6) pleading standard. In addition, I believe that he was not a limited public figure at the time the alleged defamatory headline was published. Because I would reverse the Superior Court's dismissal of Mac Isaac's defamation claim against Politico, I respectfully dissent.

### A. Background Relevant To The Politico Claim

In April 2019, Robert Hunter Biden brought three damaged laptops to Mac Isaac's computer repair shop, the Mac Shop, to recover any available data.[1] After Mac Isaac provided a keyboard to use with one laptop and determined that another was unrecoverable, Biden signed a repair authorization form and left the one remaining laptop with Mac Isaac for him to recover data. Biden returned the next day at Mac Isaac's request with an external hard drive onto which Mac Isaac could transfer the recovered data. Later the same day, Mac Isaac completed the data recovery and called Biden to notify him that the task was

---

[1] App. to Opening Br. at A13–14 (Second Amended Complaint at ¶¶ 10–17). Unless otherwise noted, the facts in this opinion are drawn from the second amended complaint and the Superior Court's September 30, 2024, opinion. *See generally* App. to Opening Br. at A12–51 (Second Amended Complaint); *Mac Isaac v. Cable News Network, Inc.*, 2024 WL 4371035 (Del. Super. Sept. 30, 2024).

42

complete and he should pick up his recovered data. Mac Isaac also sent Biden an electronic invoice for $85, but Biden never returned to the store to pay his invoice or retrieve his data.

Mac Isaac accessed Biden's personal data on his laptop while transferring it to the external hard drive. Between late July 2019 and October 14, 2020, Mac Isaac had multiple interactions with the Federal Bureau of Investigation ("FBI"), U.S. Congressional staff members, and Robert Costello ("Costello"), an attorney for Rudolph Giuliani ("Giuliani"). In December 2019, the FBI served a federal grand jury subpoena on Mac Isaac requiring that he turn over the laptop and hard drive to the FBI, which Mac Isaac did the same day.[2]

In August 2020, Mac Isaac connected with Costello and gave him a copy of the recovered data and the Repair Authorization form. Seeking to preserve his anonymity, Mac Isaac specifically asked Costello not to identify him to Giuliani or anyone else when discussing the recovered data. At some point after Mac Isaac provided a copy of the recovered data to Costello, Giuliani allegedly provided information from the recovered data to the New York Post. On October 13, 2020, Mac Isaac received a call and follow-up email from George Mesires, Biden's attorney, asking if Mac Isaac was still in possession of Biden's laptop.[3]

On October 14, 2020, at approximately 5:00 AM, the New York Post published the first article to break the news about Hunter Biden's laptop data. The article described emails indicating that Biden had introduced his father to Ukrainian business executives. It

---

[2] *Id.* at A15 (Second Amended Complaint at ¶ 25), Ex. B.

[3] *Id.* at A17 (Second Amended Complaint at ¶ 35), Ex. C.

also described a sexually explicit video that appeared to show Biden smoking crack while engaged in a sex act with an unidentified woman.[4]  Mac Isaac confirmed his identity and how he came into possession of the laptop prior to the article's publication.  He asked to remain anonymous.  Although he was not explicitly identified by name in the New York Post article, he was referred to as the "store's owner" of "a repair shop in Biden's home state of Delaware."[5]  As part of its original publication, the New York Post also published a photograph of the Repair Authorization without blurring "The Mac Shop" in one part on

---

[4]  Emma-Jo Morris & Gabrielle Fonrouge, *Smoking-gun Email Reveals How Hunter Biden Introduced Ukrainian Businessman to VP Dad*, NEW YORK POST (Oct. 14, 2020, 5:00 AM), https://nypost.com/2020/10/14/email-reveals-how-hunter-biden-introduced-ukrainian-biz-man-to-dad/.

[5]  App. to Opening Br. at A18 (Second Amended Complaint at ¶ 43).  The *New York Post* article includes the following details provided by Mac Isaac:

> The computer was dropped off at a repair shop in Biden's home state of Delaware in April 2019, according to the store's owner.
>
> . . .
>
> The customer who brought in the water-damaged MacBook Pro for repair never paid for the service or retrieved it or a hard drive on which its contents were stored, according to the shop owner, who said he tried repeatedly to contact the client.
>
> The shop owner couldn't positively identify the customer as Hunter Biden, but said the laptop bore a sticker from the Beau Biden Foundation, named after Hunter's late brother and former Delaware attorney general.
>
> Photos of a Delaware federal court subpoena given to The Post show that both the computer and hard drive were seized by the FBI in December, after the shop's owner says he alerted the feds to their existence.
>
> But before turning over the gear, the shop owner says he made a copy of the hard drive and later gave it to former Mayor Rudy Giuliani's lawyer, Robert Costello.

*See supra* note 4, Morris, "Smoking-gun Email."

the form.  As a result, the public and media were notified where Biden had dropped off his computer for repair.[6]

Later the same day, October 14, 2020, a group of several reporters from various media outlets, including the Daily Beast, "accosted" Mac Isaac at his computer repair shop to ask him questions about his involvement with the New York Post article.[7]  Later that afternoon, the Daily Beast published an article entitled, "Man Who Reportedly Gave Hunter's Laptop to Rudy Speaks Out in Bizarre Interview," identifying Mac Isaac by his full name and portraying him as confused, paranoid, and "bizarre."[8]  Among other details, the Daily Beast article stated that "Mac Isaac appeared nervous throughout" the interview, "said he was scared for his life and for the lives of those he loved," and stated that Mac Isaac "appeared not to have a grasp on the timeline of the laptop arriving at his shop and its disappearance from it."

The original publication of the Daily Beast article also included a nearly hour-long audio recording of a portion of the interview, which Mac Isaac supplied to this Court. Throughout the audio recording of the interview, Mac Isaac displays fear and reluctance to speak with the reporters, a consistent attempt to answer questions with "no comment," and

---

[6]  App. to Opening Br. at A19 (Second Amended Complaint at ¶ 44).  The original version of the article with the photograph of the Repair Authorization is available at https://web.archive.org/web/20201014115516/https:/nypost.com/2020/10/14/email-reveals-how-hunter-biden-introduced-ukrainian-biz-man-to-dad/.

[7]  *Id.* (Second Amended Complaint at ¶ 45, n.6).

[8]  Erin Banco, *Man Who Reportedly Gave Hunter's Laptop to Rudy Speaks Out in Bizarre Interview*, DAILY BEAST (Oct. 14, 2020, 3:52 PM), https://www.thedailybeast.com/man-who-reportedly-gave-hunters-laptop-to-rudy-speaks-out-in-bizarre-interview/.

a sense that he has no choice other than to speak with them. At the beginning of the recording, Mac Isaac asks, "Can we all agree to be off the record so I can find out if I can just ask if I'm allowed to talk about this, can we just do that?" Several reporters responded "no." The interview is filled with long silences before Mac Isaac gives responses such as, "I don't know how to respond to that, but I don't think I should," and "I don't know, I don't know, I'm getting exhausted."

Five days later, on October 19, 2020, more than fifty former intelligence officials signed and released a "Public Statement on the Hunter Biden Emails," stating that the information contained in the New York Post article had "all the classic earmarks of a Russian information operation," but that they "do not know if the emails . . . are genuine or not" and that they "do not have evidence of Russian involvement."[9] Later the same day, Director of National Intelligence Ratcliffe stated that the intelligence community did not believe that the Biden laptop situation was part of a Russian disinformation campaign because there was no intelligence that supported that assertion, concluding that "[i]t's simply not true."[10] The next day, October 20, 2020, the Assistant Director of the FBI's Office of Congressional Affairs, Jill C. Tyson, reported in a letter to Congress that the FBI had "nothing to add at this time to the October 19th public statement by the Director of National Intelligence about the available actionable intelligence."[11]

---

[9] App. to Opening Br. at A20 (Second Amended Complaint at ¶ 47), Ex. F.

[10] *Id.* (Second Amended Complaint at ¶ 49).

[11] *Id.* at A20–21 (Second Amended Complaint at ¶ 50), Ex. G.

On October 19, 2020, Politico published an article reporting on the public statement, entitled, "Hunter Biden story is Russian disinfo, dozens of former intel officials say."[12] The *Politico* article identified Mac Isaac indirectly, stating:

> More than 50 former senior intelligence officials have signed on to a letter outlining their belief that the recent disclosure of emails allegedly belonging to Joe Biden's son "has all the classic earmarks of a Russian information operation."
>
> The letter, signed on Monday, centers around a batch of documents released by the New York Post last week that purport to tie the Democratic nominee to his son Hunter's business dealings. Under the banner headline "Biden Secret E-mails," the Post reported it was given a copy of Hunter Biden's laptop hard drive by President Donald Trump's personal lawyer Rudy Giuliani, who said *he got it from a Mac shop owner in Delaware who also alerted the FBI.*[13]

A couple weeks later, on October 28, 2020, Mac Isaac's counsel contacted media outlets including the Wall Street Journal and the Washington Post with a statement prepared on behalf of Mac Isaac that attempted to clarify the inaccuracies about Mac Isaac published in the Daily Beast article that portrayed him as bizarre.[14] The Wall Street Journal did not respond to Mac Isaac's counsel and the Washington Post responded that they did not think the statement would "be a good fit" for the Washington Post.[15] After being unable

---

[12] Natasha Bertrand, *Hunter Biden Story Is Russian Disinfo*, *Dozens of Former Intel Officials Say*, POLITICO (Oct. 19, 2020, 10:30 PM), https://www.politico.com/news/2020/10/19/hunter-biden-story-russian-disinfo-430276.

[13] *Id.* (emphasis added).

[14] App. to Opening Br. at A19 (Second Amended Complaint at ¶ 46), Ex. D.

[15] *Id.* (Second Amended Complaint at ¶ 46), Ex. E.

to find another news organization that would publish his clarifying statement, Mac Isaac published his statement on justthenews.com on October 29, 2020, "for all to read."[16]

Following the barrage of negative press surrounding the Biden laptop incident, Mac Isaac suffered damage to his reputation and standing in the community, and the loss of his business, the Mac Shop. Although the Majority refers to him as a "bit player in a larger story," he claims the total loss of his business and reputational injury nevertheless.

Three months after publication of the Politico article, on January 21, 2021, Mac Isaac appeared on Sean Hannity's Fox News show to discuss his role in disseminating Biden's laptop data.[17] Following that appearance, he made an additional fifty-four media appearances and interviews between 2021 and early 2023, including on Fox Nation, Fox and Friends, Newsmax, Tucker Carlson Tonight, and various podcasts.[18] On November 22, 2022, Mac Isaac published a "tell-all" book about his role in the Biden laptop situation.

Mac Isaac filed his initial complaint on October 17, 2022 and filed his second amended complaint, the operative complaint in this case, on August 2, 2023. I focus only on his claims against Politico in the operative complaint. Mac Isaac alleged that Politico defamed him in the headline attached to an article published on October 19, 2020: "Hunter Biden story is Russian disinfo, dozens of former intel officials say."[19]

---

[16] *Id.* at A21 (Second Amended Complaint at ¶ 52); *see also* John Solomon, *Lawyer for Delaware Shop Owner*: *FBI Initially Turned Down Purported Hunter Biden Laptop*, JUST THE NEWS (Oct. 29, 2020, 9:46 PM), https://justthenews.com/accountability/russia-and-ukraine-scandals/lawyer-delaware-shop-owner-fbi-initially-turned-down.

[17] App. to Biden's Answering Br. at B31.

[18] *Id.*

[19] *Id.* at *5.

Politico filed a Rule 12(b)(6) motion to dismiss. The Superior Court issued its memorandum opinion on September 30, 2024, dismissing the entire case. The Majority has now affirmed that dismissal.

## B. Standard Of Review

"We review the Superior Court's grant of a motion to dismiss under a *de novo* standard of review and apply the same standard as the trial court."[20] Delaware has a relatively lenient pleading standard. A motion to dismiss should be denied unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[21]

## C. Analysis

Under Delaware law, a successful claim for defamation requires a plaintiff to plead and ultimately prove that: "1) the defendant made a defamatory statement; 2) concerning the plaintiff; 3) the statement was published; and 4) a third party would understand the character of the communication as defamatory."[22] If a plaintiff is a public figure, even for a limited purpose, he must also plead and prove that: "5) the statement is false and 6) that the defendant made the statement with actual malice."[23] Even if the plaintiff is not a public figure or limited public figure, "when the challenged statement is on a matter of public

---

[20] *Page v. Oath Inc.*, 270 A.3d 833, 842 (Del. 2022) (citing *Difebo v. Bd. of Adjustment of New Castle Cnty.*, 132 A.3d 1154, 1156 (Del. 2016).

[21] *See Central Mortgage Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 536 (Del. 2011).

[22] *Page v. Oath Inc.*, 270 A.3d 833, 842 (Del. 2022) (quoting *Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005)).

[23] *Id.* (quoting *Cahill*, 884 A.2d at 453).

concern, the plaintiff must demonstrate that the statement was false."[24]  The plaintiff's claim must adequately plead these elements to survive a Rule 12(b)(6) motion to dismiss. I believe that Mac Issac's claim against Politico meets the lenient "reasonably conceivable" standard.

Mac Isaac alleged that on October 19, 2020, Politico published an article with a defamatory headline: "Hunter Biden story is Russian disinfo, dozens of former intel officials say."[25]  He further alleged that news providers focus particular attention on headlines and that studies show that many readers browse headlines but do not read the full underlying article, which makes headlines particularly powerful.  He alleged that the article relied on the public statement by former intelligence officials, but that the Politico headline said that the Hunter Biden laptop story *is* Russian disinformation, which was not supported by the public statement.  Essentially, Mac Isaac argued that the headline is false because the letter signed by the former intelligence officials only stated that they suspected the laptop story was Russian disinformation, while the Politico headline stated as fact that the laptop story *is* Russian disinformation.  He further alleged that Politico published the article with the false headline knowing that it was false because the article reported that the Director of National Intelligence, John Ratcliffe, said on October 19, 2020, that "the intelligence community doesn't believe [that the Hunter Biden laptop situation is part of a Russian disinformation campaign] because there is no intelligence that supports that

---

[24] *Cousins v. Goodier*, 283 A.3d 1140, 1148 (Del. 2022) (citing *Phila. Newspapers*, *Inc. v. Hepps,* 475 U.S. 767, 775–76 (1986)).

[25]  App. to Opening Br. at A32 (Second Amended Complaint at ¶ 103).

[assertion] and *we have shared no intelligence with Chairman Schiff or any other member of Congress that Hunter Biden's laptop is part of some Russian disinformation campaign. It's simply not true . . .*"[26]

Mac Isaac alleged that the false and defamatory publication by Politico implied that he was part of a Russian disinformation campaign or was a Russian agent, and implied that he committed crimes, including treason, by being part of a Russian attempt to undermine American democracy and the 2020 presidential election.

The trial court dismissed Mac Isaac's defamation claim against Politico on three grounds: (1) the headline "does not mention Mac Isaac, either directly or indirectly," (2) the headline is not defamatory because it includes a sub-headline, which the trial court found "clarifies the headline," and (3) Mac Isaac is a limited public figure and did not adequately plead actual malice.[27]  The trial court's reasoning is as follows:

> Regardless of whether the headline is true or false, it does not mention Mac Isaac, either directly or indirectly. Furthermore, the sub-headline states, "More than 50 former intelligence officials signed a letter casting doubt on the provenance of a New York Post story on the former vice president's son," which clarifies the headline. As with CNN's motion to dismiss, even if the statements were defamatory or concerned Mac Isaac, he is a limited public figure and he has not adequately pled actual malice. Therefore, Politico's motion to dismiss is GRANTED.[28]

The Majority has affirmed the trial court's dismissal of Mac Isaac's defamation claim against Politico only on the grounds that the headline was not "of and concerning"

---

[26]  App. to Opening Br. at A20 (Second Amended Complaint at ¶ 49) (Italics in Second Amended Complaint).

[27]  *Mac Isaac*, 2024 WL 4371035, at *5.

[28]  *Id.*

51

Mac Isaac, as required for a successful defamation claim. I respectfully disagree with the Majority's and the trial court's conclusion that Mac Isaac was not identified by the headline directly or indirectly.

I first address whether Mac Isaac adequately pled a defamation claim, in other words, whether it is reasonably conceivable based on the allegations in the second amended complaint that the headline was defamatory, that it was "of and concerning" Mac Isaac, that it was published, and that a third party would understand the nature of the statement as defamatory.

### 1. *Mac Isaac Adequately Pled that the Politico Article Headline Defamed Him*

The modern law of defamation is a reflection of society's attempt to balance two important but often conflicting policies: on one hand, protecting a person's good name and reputation, and on the other, encouraging freedom of expression.[29] The United States Supreme Court has made clear that some erroneous statements are inevitable in free debate and must be protected if the freedom of expression is to have the "breathing space" it needs to survive.[30] However, "[a]lthough there is latitude, the speaker or writer does not have unfettered and unconditional carte blanche to publish false statements about public figures."[31] The United States Supreme Court has repeatedly made clear that "there is also another side to the equation" and has "regularly acknowledged the 'important social values

---

[29] *Spence v. Funk*, 396 A.2d 967, 969 (Del. 1978).

[30] *New York Times*, *Inc. v. Sullivan*, 376 U.S. 254, 271–72 (1964).

[31] *Page*, 270 A.3d at 852 (Valihura, J., dissenting) (dissenting from Majority's affirmance of the Superior Court's dismissal of Carter Page's defamation claim against Oath regarding an article entitled, "U.S. intel officials probe ties between Trump adviser and Kremlin.").

which underlie the law of defamation."[32]  As the Supreme Court has observed, "[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation."[33]

This Court has recognized similar protection against reputational harm afforded to Delaware citizens by the Delaware Constitution.  For example, in *Kanaga v. Gannett Co.*, we stated that "the protection afforded to reputations by the Delaware Constitution weighs heavily in the balance of the analysis involving constitutionally protected speech."[34]  We recently observed in *Cousins v. Goodier* that "[a] statement is defamatory when it 'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'"[35]  To be actionable, a defamation plaintiff must plead that "the defendant made a statement about the plaintiff that would be understood as defamatory by a reasonable third party and was published."[36]  Publication of the statement only requires that "it was communicated by any method, to one or more persons who can understand the meaning."[37]  Additionally, there is no liability without fault in defamation law, so even though a private plaintiff is not required to plead

---

[32]  *Id.*; *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 22 (1990) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966)).

[33]  *Rosenblatt*, 383 U.S. at 86.

[34]  *Kanaga v. Gannett Co.*, 687 A.2d 173, 177 (Del. 1996); *see also* Del. Const. art. I, § 9 ("All courts shall be open; and every person for an injury done him or her in his or her reputation, person, movable or immovable possessions, shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial, or unreasonable delay or expense.  Suits may be brought against the State, according to such regulations as shall be made by law.").

[35]  *Cousins*, 283 A.3d at 1148 (quoting Restatement of Torts § 559 (1938)).

[36]  *Id.* (quoting *Page*, 270 A.3d at 843).

[37]  *Id.* (quoting Dobbs, et al., *The Law of Torts* § 520, at 176 (2011)).

and prove actual malice the way a public figure would be, a private plaintiff "must show that the defendant acted at least negligently."[38] Finally, "when the challenged statement is on a matter of public concern, the plaintiff must demonstrate that the statement was false."[39]

I take each of these requirements in turn. First, there is no dispute that the alleged defamatory statement, the article's headline, was published on Politico's website on October 19, 2020. Mac Isaac pled as much in his second amended complaint: "On October 19, 2020, POLITICO published an article entitled: Hunter Biden story is Russian disinfo, dozens of former intel officials say."[40]

Second, Mac Isaac adequately alleged that the Politico headline was a defamatory statement, in other words, that it tended "to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Mac Isaac alleged that the "50 former senior intelligence officials *did not* state that the Hunter Biden story *IS* Russian disinformation – that was POLITICO."[41] He alleged that "POLITICO knowingly published the article with a false headline stated as fact about [Mac Isaac] and others involved in releasing the information about the laptop."[42] He

---

[38] *Id.* (citing *Page*, 270 A.3d at 843; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974); *Times*, 376 U.S. at 287).

[39] *Id.* (citing *Hepps*, 475 U.S. at 776 ("We believe that the common law's rule on falsity—that the defendant must bear the burden of proving truth—must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.")).

[40] App. to Opening Br. at A32 (Second Amended Complaint at ¶ 103). This paragraph of the complaint included a screenshot of the title of the article as well as a link to the website where the article could be found.

[41] *Id.* at A33 (Second Amended Complaint at ¶ 109) (emphasis in original).

[42] *Id.* at A34 (Second Amended Complaint at ¶ 115).

alleged that the Politico headline included "allegations that the information published by the NY Post, which POLITICO clearly identifies the information as coming from Plaintiff, was part of a Russian disinformation campaign, thereby directly implying that the Plaintiff [was] part of a Russian disinformation campaign and/or, more specifically, a Russian agent."[43] He alleged that "[f]ormer Director of National Intelligence James Clapper, one of the former senior intelligence officers who signed the public statement, said Politico's October 19, 2020 article 'deliberately distorted' what was said."[44]

He pled that the headline "alleges that Plaintiff committed crimes including (but not limited to) working with Russians to spread 'disinformation' relating to the son of Democratic Party nominee, now President, Joseph Biden, thereby implicating Plaintiff in the commission of a treasonous act by being part of an attempt to undermine American democracy and the 2020 Presidential election."[45] He similarly alleged that "POLITICO's publication of false statements imply that Plaintiff has committed an infamous crime, *i.e.*, treason and/or other crimes against the United States of America by participating in a Russian attempt to undermine American democracy and the 2020 Presidential election."[46]

Mac Isaac alleged resulting reputational harm. He alleged that the Politico publication "is of the kind that would tend to, and in fact did, prejudice the Plaintiff in the

---

[43]  *Id.* (Second Amended Complaint at ¶ 117).

[44]  *Id*. at A33 (Second Amended Complaint at ¶ 110).

[45]  *Id.* at A35 (Second Amended Complaint at ¶ 120).

[46]  *Id.* at A36 (Second Amended Complaint at ¶ 126).

eyes of a substantial and respectable portion of the community at large."[47]  He alleged that Politico "knew or should have known such false statements in the publication would likely result in material and substantial injury to Plaintiff, as the statements call into question Plaintiff's loyalty to the United States."[48]  He further alleged that "POLITICO knew or should have known such false statements in the publication would likely result in subjecting Plaintiff to distrust, scorn, ridicule, hatred, and contempt, which continues to this day."[49]  Finally, he alleged that as a direct and proximate result of Politico's publication, he "suffered, and continues to suffer, substantial damages, including the loss of his business."[50]

These well-pled facts, accepted as true for the purposes of reviewing a Rule 12(b)(6) motion to dismiss, make it reasonably conceivable that Politico's headline that the "Hunter Biden story is Russian disinfo" would damage the reputation and community standing of anyone alleged to have been part of a Russian disinformation campaign to interfere with a presidential election.  It is reasonably conceivable that as a publicly known source of Hunter Biden's laptop, and thus the source of the "story" at issue in the headline, the Politico headline implied that Mac Isaac was part of a Russian disinformation campaign. It is reasonably conceivable that being accused of being part of a Russian disinformation campaign would damage Mac Isaac's reputation and subject him to distrust, scorn, ridicule,

---

[47]  *Id.* at A35 (Second Amended Complaint at ¶ 121).

[48]  *Id.* (Second Amended Complaint at ¶ 124).

[49]  *Id.* (Second Amended Complaint at ¶ 125).

[50]  *Id.* at A36 (Second Amended Complaint at ¶ 127).

hatred, and contempt in his community, as well as the loss of his business. In short, Mac Isaac adequately alleged that Politico's headline was defamatory.

Third, Mac Isaac adequately alleged that the Politico headline was "of and concerning" him. Admittedly, this is a close issue. Mac Isaac alleged that the Politico headline included "allegations that the information published by the NY Post, which POLITICO clearly identifies the information as coming from Plaintiff, was part of a Russian disinformation campaign, thereby directly implying that the Plaintiff [was] part of a Russian disinformation campaign and/or, more specifically, a Russian agent."[51]

The Majority views this allegation as a concession that the only way readers would know that the headline was "of and concerning" him is if they read the entire article, which makes a passing reference to a "Mac shop owner in Delaware who also alerted the FBI." But Mac Isaac's acknowledgment that the Politico article identified him as the source of the information was not a concession that he could *only* be identified through the article's identification of him. Rather, Mac Isaac also alleged that the original New York Post article notified "the public and the media" that the laptop had originated from his computer repair shop.[52] Further, he alleged that later the same day that the article was published, "*subsequent* to the NY POST's disclosure of [his] identity," other media outlets did identify him, interview him, and write articles about him.[53] These allegations, which should be accepted as true for the purposes of this appeal, support a reasonable inference that

---

[51] *Id.* at A34 (Second Amended Complaint at ¶ 117).

[52] *Id.* at A19 (Second Amended Complaint ¶ 44).

[53] *Id.* (Second Amended Complaint ¶ 45).

someone following the presidential election and the Hunter Biden laptop story, which was widely reported upon as soon as the story broke, would know that Mac Isaac was the source of the laptop.

In view of this reality, Mac Isaac plausibly argues that he "may not have been specifically named in the defamatory statements/publications, but he had become so intertwined with the Hunter Biden laptop story that a common mind, especially a person familiar with Mac Isaac, would find the defamatory statements/publications by the Defendants 'of and concerning' the Plaintiff."[54] Thus, I agree with Mac Isaac that a reasonable reader would have connected these dots even without the identification of Mac Isaac within the body of the October 19, 2020, Politico story—a fact rigidly relied upon on by the Majority.[55]

---

[54] Opening Br. at 20. The Majority states that Mac Isaac did not frame his argument in this Court this way. I disagree. *See*, *e.g*., Opening Br. at 3 ("The court's decision overlooked the reasonable perception of the public, which linked the defamatory statements to Mac Isaac."); *id*. ("Mac Isaac had become so intertwined with the Hunter Biden laptop story that the public could reasonably associate the defamatory statements with him, even if he was not named."); *id.* at 6 ("Mac Isaac became synonymous with the 'Delaware computer repair shop owner,' identified in Politico's article."); *id.* at 16 ("His identity was negligently released and, as a result, his identity as the 'Delaware computer repair shop owner' became ubiquitous with the 'Hunter Biden laptop.'").

[55] I do not think the Majority's analogy of Mac Isaac's computer repair shop to a used bookstore is apt, and Mac Isaac's allegations refute such a notion. Bookstore owners do not take apart books and repair, recover and transfer the contents of the books to hard drives. Mac Isaac alleges that the laptop was left in his shop so that he could recover data from it; that Biden left a Western Digital external hard drive onto which Mac Isaac was to transfer the recovered data; that Biden never returned to pick up the laptop and external hard drive; and that Hunter Biden had stated that the laptop could have been hacked, stolen from him and part of a Russian intelligence campaign. *See*, *e.g*., App. at A14, 15, 42 (Second Amended Complaint at ¶¶ 12-22, and 155). Mac Isaac argues that "[t]he allusion was that the information Mac Isaac provided to the FBI and to Mr. Rudy Giuliani had been hacked by Mac Isaac and that Biden had never dropped off a laptop at Mac Isaac's shop."). Opening Br. at 20.

Moreover, the Majority's conclusion that Mac Isaac did not sufficiently allege a connection between the alleged defamatory statements and him is inconsistent with our recent precedent. In *Cousins v. Goodier*, Cousins claimed that even if Goodier's statements were opinion, they implied the existence of undisclosed defamatory facts that were provably false. Cousins had asserted that Goodier's email did not attach, or contain a link to, the lawsuit he filed, and thus, her defamatory email lacked a factual basis and required readers to speculate about what statements Cousins had made. However, in rejecting that assertion, our Court observed that "Goodier did include a link to a newspaper article that described the lawsuit."[56] Thus, we had no trouble looking outside the four corners of the defamatory email to determine what other information readers had. We observed that the readers were sophisticated lawyers who knew how to find Cousins' lawsuit referenced in Goodier's email, "even if the record does not show at this stage whether they in fact reviewed it."[57] We concluded, therefore, that the recipients of the defamatory email did not have to speculate or wonder about the facts underpinning Goodier's statements. The "reality" that they could find them was sufficient to defeat Cousins' claim that Goodier's email implied defamatory facts about Cousins that were provably false. As a result, this Court affirmed the dismissal of Cousins' defamation claim.

---

[56] *Cousins*, 283 A.3d at 1158. We concluded that Goodier's email was defamatory and that it had been published. What remained contested was whether the statements in the emails reasonably could be read to state or imply provably false and defamatory facts about Cousins. As explained above, we held that readers could find the facts from the link.

[57] *Id.* at 1159.

Similarly here, it is at least reasonably conceivable that the readers of the Politico article would be able to easily determine that Mac Isaac was the source of the laptop who was connected with the Russian disinformation campaign. Certainly the mob of reporters who stormed his shop the same day the New York Post article was published had no trouble making that connection. I submit the average reader would similarly have had no difficulty.

Next, the Majority correctly notes that Mac Isaac has focused his claim on the defamatory headline, separate from the sub-headline and underlying article. The Majority, however, argues that the sub-headline and underlying article must be considered if the reader is to conclude that the headline is "of and concerning" Mac Isaac. They say that the sub-headline and underlying article are "substantially true," and that the sub-headline *clarifies* the headline. The Majority misses the fact that Mac Isaac is indirectly identified by the headline without any reference to the underlying article, as I explained above, because he was already publicly known as the source of the laptop story.

Further, analyzing the claim as Mac Isaac pled it, Mac Isaac alleged only that the Politico headline was defamatory, not the entire article.[58] He alleged that "[s]tudies have shown that many readers browse headlines and do not read the actual underlying article" and that "news providers focus particular attention to the headline in order to drive readers to their site."[59] Here, the headline was much more prominent than the sub-headline,

---

[58] He has not contested that the body of the article is substantially true as the Majority points out.

[59] *Id.* at A32 (Second Amended Complaint ¶¶ 104–05).

60

significantly larger, and was bolded. The sub-headline appears immediately above the photograph and its font size appears to be smaller than even than the typeface used in the underlying article. The sub-headline was not bolded either.

Courts have frequently held that a headline can be defamatory independent of an accurate underlying article, particularly where the headline is not a fair representation of the article.[60] Although other courts have held that it is more appropriate to construe a headline in conjunction with its attached article, one respected commentator points to the West Virginia Supreme Court's decision in *Sprouse v. Clay Communications, Inc.*[61] as having "devised a very intelligent synthesis of the two positions." That court reasoned that:

> Generally, where the headline is of normal size and does not lead to a conclusion totally unsupported in the body of the story, both headlines and story should be considered together for their total impression. *However,*

---

[60] *See, e.g.*, *Reardon v. News-Journal Co.*, 164 A.2d 263, 265 (Del. 1960) (explaining that "the sting of a libel may sometimes be contained in a word or sentence used in a headline to the body of the article, even though the facts are correctly set forth in the body" and analyzing "the effect of the headline apart from the article itself" but acknowledging in other circumstances, it may be appropriate to read the headline in the full context of the article and declining to sanction one approach over the other); *Ramunno v. Cawley*, 705 A.2d 1029, 1037-38 (Del. 1998) (discussing *Reardon,* acknowledging both approaches but not reaching the claim that the headline itself was libelous); *Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E. 2d 446, 458 (Ind. 1999) (explaining that "a defamatory headline will be actionable even if the story is accurate, unless the headline is a fair index of the accurate article"); *Las Vegas Sun v. Franklin,* 74 Nev. 282, 287 (Nev. 1958) (holding that "[t]he defamation of Franklin contained in the headline was complete upon its face," and that "[i]t was not necessary to read the article in order that the defamatory nature of the statement be understood or connected with Franklin."); *Schermerhorn v. Rosenberg*, 426 N.Y.S.2d 274, 283 (N.Y. Sup. Ct. 1980) ("If the headline is a fair index of an accurate article, it is not actionable. If it is not a fair index, then the headline must be examined independently to determine whether it is actionable under general principles of libel. That the defamatory meaning of the headline may be dispelled by a reading of the entire article is of no avail to the publisher. A headline is often all that is read by the casual reader and therefore separately carries a potential for injury as great as any other false publication.").

[61] 211 S.E.2d 674 (W. Va. 1975), *cert. denied*, 423 U.S. 882 (1975).

*where oversized headlines are published which reasonably lead the average reader to an entirely different conclusion than the facts recited in the body of the story, and where the plaintiff can demonstrate that it was the intent of the publisher to use such misleading headlines to create a false impression on the normal reader, the headlines may be considered separately with regard to whether a known falsehood was published.*[62]

This commentator observed that, "[t]his is an eminently sensible compromise; it has been cited with apparent approval in several other decisions."[63]  I agree that this is a sensible approach and one which appropriately requires the court to consider the unique facts of each case.  Where, as here, the headline is not a fair representation of the underlying article, and where it is much more prominent than the sub-headline and text, the headline should be analyzed separately.

In addition to the sub-headline's deemphasized size and position, I question how "clarifying" it truly is.  The sub-headline reads: "More than 50 former intelligence officials signed a letter casting doubt on the provenance of a New York Post story on the former vice president's son."  The most common definition of "provenance" is "origin" or "source."[64]  Thus, if anything, the sub-headline also indirectly identifies Mac Isaac who had become known as the source and provider of the laptop.  Moreover, because it is

---

[62]  *Id*. at 686.

[63]  Rodney A. Smolla, 1 Law of Defamation § 4:28 at 4-99 (2d ed.) (May 2025 Update).

[64]  *See, e.g.*, Webster's Third New Int'l Dictionary (unabridged) (2002) (provenance:  coming from, originating in . . . place of origin:  source . . .,).  Further, as Bryan A. Garner observes, both "provenance" and "provenience" "are formal words for origin or source," and that 'provenance' is the more usual word throughout the English-speaking world, usually in reference to art, antiques, artifacts and other fields in which proof of authenticity is an issue."  Garner's Modern English Usage at 892 (5th ed. 2022).

questionable whether average readers would agree on what "*the provenance*" of a news story is, I doubt the sub-headline adds any discernable clarity.[65]

Fourth, Mac Isaac adequately pled that third parties would understand the character of the headline as defamatory. He pled that "POLITICO knowingly published the falsehoods as facts to third parties – its readers" and that "POLITICO knew or should have known such false statements in the publication would likely result in material and substantial injury to Plaintiff, as the statements call into question Plaintiff's loyalty to the United States" and "would likely result in subjecting Plaintiff to distrust, scorn, ridicule, hatred, and contempt, which continues to this day."[66]

Fifth, because the Hunter Biden laptop story was directly related to the United States presidential election, it was without question a matter of public concern, and Mac Isaac was required to plead that the challenged headline was provably false.[67] He did so. As quoted at length above, Mac Isaac pled that the Politico headline that the Hunter Biden story was Russian disinformation was false.[68] Mac Isaac also pled that certain statements in the public statement from the former intelligence officials stated that the story was not

---

[65]  It would be an interesting experiment to randomly ask 50 people on the streets of New York (where the story was initially published) what it means for someone to question "the provenance" of a news story.

[66]  *Id.* at A35 (Second Amended Complaint at ¶¶ 122, 124, 125).

[67]  *See Milkovich*, 497 U.S. at 19–20 ("[W]e think *Hepps* stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved.").

[68]  *Id.* at A33 (Second Amended Complaint at ¶ 109).

Russian disinformation and that a spokesman for them later said that Politico "deliberately distorted" what they had said.[69]

Finally, because there is no liability without fault in a defamation claim, Mac Isaac was required to plead that Politico at least negligently published the false headline. Mac Isaac went much further than that. He alleged that "[t]he defamatory publication was made negligently; without reasonable care as to its truth or falsity, with knowledge of its falsity, and/or with reckless disregard for the truth."[70] He further pled in three different places that Politico "knew or should have known" that its false statement would cause him harm and that he had no comparable way to defend himself.[71] He alleged in three additional places that Politico "knowingly falsely stated as fact in the title of its article that the Hunter Biden story *IS* Russian disinformation," "knowingly published the article with a false headline stated as fact," and "knowingly published the false factual statement."[72] Mac Isaac alleged that "POLITICO acted with actual malice towards the Plaintiff as it intended to cause harm to the reputation of the Plaintiff and any parties affiliated with the release of the information on the laptop through the knowing publication of its false statements."[73] Finally, he alleged that "POLITICO had actual knowledge of the falsity of the claims and understood the high probability that injury or damage would result to Plaintiff."[74] Based upon his allegations

---

[69] *Id.* (Second Amended Complaint at ¶¶ 110–12).

[70] *Id.* at A34 (Second Amended Complaint at ¶ 118).

[71] *Id.* at A35 (Second Amended Complaint at ¶¶ 123–25).

[72] *Id.* at A34 (Second Amended Complaint at ¶¶ 113, 115–16).

[73] *Id.* at A36 (Second Amended Complaint at ¶ 128).

[74] *Id.* (Second Amended Complaint at ¶ 129).

which we assume to be true for purposes of a motion to dismiss, it is reasonably conceivable that Politico knew that the headline was false or at least acted negligently with regard to its truth or falsity. Accordingly, I believe each required element of Mac Isaac's defamation claim against Politico has been adequately pled.

2. *Mac Isaac Was Not a Limited Public Figure at the Time the Politico Article Was Published and Was Not Required to Plead Actual Malice*

Because I believe that Mac Isaac adequately pled his underlying defamation claim against Politico, I next address the issue of whether Mac Isaac was a limited public figure who was required to plead the additional element for public figures and limited public figures, namely, actual malice. Mac Isaac argues that the trial court erred when it granted Politico's motion to dismiss partially on the grounds that he was a limited public figure and failed to adequately plead actual malice. He does not challenge on appeal the trial court's determination that he did not adequately plead actual malice. Therefore, the survival of his claim, in my view, would depend on whether he was required to plead actual malice to begin with. I believe the trial court erred in determining that he was a limited public figure. Thus, he was not required to plead actual malice.

Delaware's actual malice requirement for public figure defamation claims tracks the federal First Amendment principles first set forth by the United States Supreme Court in its seminal case *New York Times v. Sullivan*.[75] The *Times* case arose from the struggle for racial equality in the South and an advertisement that the New York Times ran in 1960 that supported the legal defense of Dr. Martin Luther King, Jr. and criticized particular state

---

[75] 376 U.S. 254 (1964).

65

and local government responses to various political demonstrations.[76]  Deciding whether

Alabama defamation law was consistent with the First Amendment, the Court reviewed the

damages award "against the background of a profound national commitment to the

principle that debate on public issues should be uninhibited, robust, and wide-open, and

that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on

government and public officials."[77]  As the Court famously held: "The constitutional

guarantees require, we think, a federal rule that prohibits a public official from recovering

damages for a defamatory falsehood relating to his official conduct unless he proves that

the statement was made with 'actual malice'—that is, with knowledge that it was false or

with reckless disregard of whether it was false or not."[78]  Three years later, the Supreme

Court extended this high bar applicable to public officials to "public figures" not holding

governmental office in the companion cases *Associated Press v. Walker*[79] and *Curtis

Publishing Co. v. Butts*.[80]

The Supreme Court further extended the "actual malice" requirement to what are

generally known as "limited public figures" in the seminal case, *Gertz v. Robert Welch,

Inc.*[81]  In *Gertz*, a respected attorney and law professor, Elmer Gertz, agreed to represent

the family of 17-year-old Ronald Nelson to pursue civil remedies against Richard Nuccio,

---

[76]  *Id.* at 256–61; *see also* Rodney A. Smolla, *Law of Defamation* § 2:2 (2d ed. 2015).

[77]  *Times*, 376 U.S. at 270.

[78]  *Id.* at 279–80.

[79]  388 U.S. 130, 155, 162-63 (1967).

[80]  *Id.*

[81]  418 U.S. 323 (1974).

a Chicago police officer who had killed Nelson.[82]  Nuccio was convicted of Nelson's

murder, but Gertz was not involved in the criminal prosecution and made no public

statements concerning any of the litigation.  After Nuccio's conviction, a magazine owned

by Robert Welch, Inc. published an article titled "Frame-Up—Richard Nuccio and the War

on Police."  The article stated that Gertz had been an official of the Marxist League for

Industrial Democracy which advocated the violent seizure of our government.  It labeled

Gertz a "Leninist" and a "Communist-fronter."[83]  Gertz filed a libel action against Robert

Welch, Inc., who claimed in response that Gertz was a public figure and that Robert Welch,

Inc. was entitled to the *Times* actual malice standard.[84]

In *Gertz*, the Supreme Court considered the question of whether a newspaper or

broadcaster that publishes defamatory falsehoods about an individual who is neither a

public official nor a public figure may claim constitutional privilege against liability for

the injury inflicted by those statements.  It attempted to accommodate and balance the

competing values of "uninhibited, robust, and wide open" debate on public issues with

society's need to protect against reputational harm.[85]  The *Gertz* Court reiterated its

aversion to self-censorship in the press, and attempted to resolve the inherent tension

between freedom of speech and protection of reputation by announcing guidelines that set

forth the minimum constitutional requirements for compensating individuals for harm

---

[82]  *Id.* at 325–26.

[83]  *Id*. at 326.

[84]  *Id.* at 327.

[85]  *Id.* at 340–41.

inflicted on them by a defamatory falsehood.[86]   The Supreme Court explained the two primary rationales for requiring a public figure to plead actual malice.

First, the Court focused on the superior access to the media that public figures enjoy: "Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy."[87]   Second, the Court focused on a public figure's assumption of risk regarding the added scrutiny that accompanies a voluntary entry into public life:

> An individual *who decides to seek* governmental office must accept certain necessary consequences of that involvement in public affairs.  He runs the risk of closer public scrutiny than might otherwise be the case.
> . . . .
> Those classed as public figures stand in a similar position.  Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare.  For the most part those who attain this status have assumed roles of especial prominence in the affairs of society.  Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes.  More commonly, those classed as public figures *have thrust themselves to the forefront of particular public controversies* in order to influence the resolution of the issues involved.  In either event, *they invite attention and comment.*[88]

Next, the Court explained that classification as a public figure can come in two forms:

> Respondent's characterization of [Gertz] as a public figure raises a different question.  That designation may rest on either of two alternative bases.  In some instances an individual may achieve such pervasive fame or notoriety

---

[86]  *Id.* at 341–52; *see also* Smolla, *Law of Defamation* § 2:12.

[87]  *Gertz*, 418 U.S. at 344.

[88]  *Id.* at 344-45 (emphasis added).

that he becomes a public figure for all purposes and in all contexts. More commonly, an individual *voluntary injects himself or is drawn into a particular public controversy* and thereby becomes a public figure for a limited range of issues.[89]

Both the Supreme Court's description of the path to becoming a limited public figure and the Court's discussion of the rationales for treating public figures under a different standard focus heavily on an individual's voluntary assumption of public status that invites attention and accepts the risk of public scrutiny.

Since *Gertz*, the United States Supreme Court has decided only three cases concerning limited public figures all in the 1970's -- more than four decades ago. The emphasis on voluntariness that was first discussed in *Gertz* is a theme that runs throughout those cases. In *Time, Inc. v. Firestone*,[90] the Supreme Court held that Mary Alice Firestone was not a limited public figure with regard to her divorce, despite her social prominence and the fact that she had given press conferences related to her divorce proceedings.[91] The Supreme Court held that initiating her divorce litigation was not a purposeful insertion into a matter of public controversy because "she was compelled to go to court by the state in order to obtain legal release from the bonds of matrimony."[92] By extension, the Supreme Court refused to extend *Times* speech protection to all reports of judicial proceedings because the majority of litigants would resemble Mary Alice Firestone, "drawn into a

---

[89] *Id.* at 351 (emphasis added).

[90] 424 U.S. 448 (1976).

[91] *Id.* at 453.

[92] *Id.* at 454.

public forum largely against their will in order to attempt to obtain the only redress available to them or to defend themselves against actions brought by the State or others."[93]

Three years later, in *Wolston v. Reader's Digest Association, Inc.*,[94] the Supreme Court held that Ilya Wolston was not a limited public figure and, therefore, was not required to meet the actual malice standard. He had failed to appear for a grand jury subpoena after his aunt and uncle pled guilty to espionage charges. Wolston pled guilty to a criminal contempt charge. Fifteen newspaper articles were written about his failure to appear and conviction.[95] The Supreme Court expressly rejected the reasoning of the lower courts that Wolston had "voluntarily thrust" or "injected" himself into the forefront of the public controversy surrounding the investigation of Soviet espionage in the United States simply because he failed to appear to a grand jury subpoena.[96] Instead, the Supreme Court found that "[i]t would be more accurate to say that petitioner was dragged unwillingly into the controversy."[97] Although his failure to appear and subsequent citation for contempt did attract media attention, the Supreme Court held that "the mere fact that petitioner voluntarily chose not to appear before the grand jury, knowing that his action might be attended by publicity, is not decisive on the question of public-figure status."[98] Instead, "a

---

[93] *Id.* at 457.

[94] 443 U.S. 157 (1979).

[95] *Id.* at 162–63.

[96] *Id.* at 166.

[97] *Id.*

[98] *Id.* at 166–67.

court must focus on the 'nature and extent of an individual's participation in the particular controversy giving rise to the defamation.'"[99]

The simple fact that the events in question attracted media attention was also not determinative of public figure status. As the Supreme Court held, "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention."[100] The Court emphasized that Wolston had not voluntarily engaged the attention of the public in an attempt to influence the resolution of the issues involved and that his failure to appear was not calculated to draw attention to himself in order to invite public comment or influence the public with respect to any issue, but rather was the result of his own poor health. Thus, the most important factor in determining whether he was a limited purpose figure was whether he voluntarily sought public prominence or influence. Ultimately, the Court concluded that there was "no basis whatsoever for concluding that petitioner relinquished, to any degree, his interest in the protection of his own name" and reversed the lower court's holding that Wolston was a public figure.[101]

Also in 1979, in *Hutchinson v. Proxmire*,[102] the Supreme Court, following its reasoning in *Firestone* and *Wolston,* again held that a petitioner was not a limited public figure within the narrowed meaning of that term. Research director and professor Ronald

---

[99] *Id.* at 167.

[100] *Id.*

[101] *Id.* at 168–69.

[102] 443 U.S. 111 (1979).

Hutchinson was awarded federal research grants by NASA and other federal agencies to study emotional behavior in animals. The studies had potential implications for human behavior in confined spaces such as rocket ships and submarines. After United States Senator William Proxmire gave his "Golden Fleece Award" for the most wasteful government spending to Hutchinson and ridiculed his research in a speech and newsletter, Hutchinson brought a defamation action against Proxmire.

The Supreme Court held that although Hutchinson had voluntarily applied for federal grants and local newspapers reported on those grants, and although some news outlets reported on his response to the announcement of the Golden Fleece Award, neither was enough to demonstrate that Hutchinson was a limited public figure prior to the controversy engendered by the Golden Fleece Award.[103] To the extent Hutchinson's writings became a matter of controversy, it was only because of the Golden Fleece Award. The Supreme Court noted that Hutchinson did not "thrust himself or his views into public controversy to influence others" and stated that no particular controversy was identified beyond a concern about general public expenditures that is shared by most. Hutchinson did not voluntarily enter public life. Rather, Proxmire himself created Hutchinson's notoriety. The Supreme Court reiterated its principle from *Wolston* that this kind of bootstrapping was not enough: "Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."[104]

---

[103] *Id.* at 134–35. Rather, the Supreme Court found that Hutchinson's access came after the alleged libel. *Id.* at 135.

[104] *Id.* (citing *Wolston*, 443 U.S. at 167–68).

Moreover, the Court found that neither Hutchinson's applications for federal grants nor his publications in professional journals "invited that degree of public attention and comment on his receipt of federal grants essential to meet the public figure level."[105] Finally, the Supreme Court explained that Hutchinson did not have such access to the media that he should be labeled a public figure because his access was limited to responding to the announcement of the award. He did not have the "regular and continuing access to the media that is one of the accouterments of having become a public figure."[106]

The Supreme Court has never found a person to be a limited public figure. The practical question of how to classify individual plaintiffs as public or private figures has been primarily left to lower courts to decide in the over forty years since the Supreme Court has spoken on this issue.[107] The task has proved remarkably difficult, with one district court opining that the task "is much like trying to nail a jelly fish to the wall."[108] As a result of this difficulty, a wide variety of tests applying the rules from *Gertz* and its progeny are used by various federal and state courts. But a unifying theme from *Gertz*, *Firestone*, *Wolston*, and *Hutchinson* is that in order for a plaintiff to be a limited public figure they must have voluntarily injected themselves into a "public controversy."[109] As a result, most of the lower court approaches to describe limited public figure status involve two basic

---

[105] *Hutchinson*, 443 U.S. at 135.

[106] *Id.* at 136.

[107] *See* Smolla, *Law of Defamation* § 2:20.

[108] *Rosanova v. Playboy Enterprises, Inc.*, 411 F. Supp. 440, 443 (S.D. Ga. 1976), *aff'd*, 580 F.2d 859 (5th Cir. 1978); *Marcone*, 754 F.2d at 1082 (quoting *Rosanova*, 411 F. Supp. at 443).

[109] *See* Smolla, *Law of Defamation* § 2:21.

requirements: (1) a public controversy, and (2) voluntary involvement by the plaintiff in that public controversy. Some courts have taken an *ad hoc* case-by-case approach in applying the *Gertz* test.[110] Other courts have developed multi-factor tests attempting to flesh out these two basic factors in more detail.[111]

One such oft-quoted test comes from a D.C. Circuit case, *Waldbaum v. Fairchild Publications*,[112] which emphasized an objective three-part test. First, "the court must isolate the public controversy," which is "not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way" and that "has received public attention because its ramifications will be felt by persons who are not direct participants."[113] Second, the court must "analyze the plaintiff's role" in the controversy, and such plaintiffs "must have 'thrust themselves to the forefront' of the controversies so as to become factors in their ultimate resolution."[114] To achieve this significance, the plaintiff "either must have been purposely trying to

---

[110] *See*, *e.g.*, *Rosanova v. Playboy Enterprises*, 580 F.2d 859, 861 (5th Cir. 1978) (holding that although the public figure concept has eluded a truly working definition, it still falls within that class of legal abstractions where "I know it when I see it") (quoting *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring); *Quigley v. Rosenthal*, 43 F.Supp.2d 1163, 1177 (D. Colo. 1999) (holding that plaintiffs could begin as private figures and become limited public figures over time).

[111] *See*, *e.g.*, *Waldbaum v. Fairchild Publications*, 627 F.2d 1287, 1296-98 (D.C. Cir. 1980) (emphasizing an objective three-part test), *cert. denied*, 449 U.S. 898 (1980); *Carr v. Forbes*, *Inc.*, 259 F.3d 273, 280 (4th Cir. 2001) (announcing a five-factor test), *cert. denied*, 535 U.S. 988 (2002); *Clark v. American Broadcasting Cos.*, 684 F.2d 1208, 1218 (6th Cir. 1982) (announcing a three-factor test), *cert. denied*, 460 U.S. 1040 (1983); *Lerman v. Flynt Distributing Co.*, *Inc.*, 745 F.2d 123, 136-37 (2d Cir. 1984) (announcing a four-part test), *cert. denied*, 471 U.S. 1054 (1985).

[112] 627 F.2d 1287 (D.C. Cir. 1980).

[113] *Id.* at 1296.

[114] *Id.* at 1297.

influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution."[115] When conducting this analysis, the court can consider the plaintiff's past conduct, the extent of press coverage, and the public reaction to his conduct and statements. Finally, "the alleged defamation must have been germane to the plaintiff's participation in the controversy."[116]

The D.C. Circuit was also clear in *Waldbaum* that the assumption of risk justification from *Gertz* underpinned its requirement of voluntary participation and purposeful attempts to influence the outcome of the controversy:

> Those who attempt to affect the result of a particular controversy have assumed the risk that the press, in covering the controversy, will examine the major participants with a critical eye. Occasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome. Unless he rejects any role in the debate, he too has "invited comment" relating to the issue at hand. In any event, media coverage of the controversy can be expected to include reports on a major participant's reply to misstatements made about him. In short, the court must ask whether a reasonable person would have concluded that this individual would play or was seeking to play a major role in determining the outcome of the controversy and whether the alleged defamation related to that controversy.[117]

Like *Waldbaum*, virtually all tests announced by lower courts involve an analysis of the voluntariness of the plaintiff's participation, which is "probably the most firmly entrenched of all the factors courts consider" and "appears to be almost the exclusive preoccupation in

---

[115] *Id.*

[116] *Id.* at 1298.

[117] *Id.*

some decisions."[118] This preoccupation is consistent with the heavy focus on voluntariness that runs throughout *Gertz*, *Firestone*, *Wolston*, and *Hutchinson.*

One important question regarding voluntariness is which type of voluntary participation matters—voluntary participation in the controversy itself or voluntary acceptance or seeking of media attention.[119] In *Marcone v. Penthouse International, Ltd.*,[120] the Third Circuit embraced the view that the relevant question is whether the plaintiff voluntarily engaged in an activity out of which publicity would foreseeably arise and not whether the plaintiff desired that the activities remain private. The court announced its test for limited public figure status in the context of a plaintiff allegedly involved in the purchase and sale of illicit drugs. In determining whether Marcone, a Philadelphia attorney, was a limited public figure with regard to his alleged drug activity and association with certain motorcycle gangs, the court stated that it must consider "(1) whether drug trafficking is a 'public controversy' and (2) the 'nature and extent' of Marcone's participation in this controversy."[121]

The Third Circuit ultimately held that Marcone was a limited public figure, despite the fact that he had not intended for his activities to attract attention, because "the purpose of the first amendment would be frustrated if those persons and activities that most require

---

[118] Smolla, *Law of Defamation* § 2:31 at 2-60, 61 (collecting authorities).

[119] *Id.* at § 2:32 at 2-64.3 ("The proper question is not whether the plaintiff volunteered for the publicity but whether the plaintiff volunteered for an activity out of which publicity would foreseeably arise.").

[120] 754 F.2d 1072 (3d Cir. 1985), *cert. denied*, 474 U.S. 864 (1985).

[121] *Id.* at 1082 (quoting *Gertz*, 418 U.S. at 352).

public scrutiny could wrap themselves in a veil of secrecy and thus remain beyond the reach of public knowledge."[122] The court acknowledged, however, the potential conflict with the countervailing threat of the media bootstrapping onto public controversies of its own creation:

> We recognize that there are countervailing dangers from a media that has untrammeled freedom to publish inaccurate and damaging statements with impunity. Moreover, when a sensational story by one news organization is picked up by many, the snowballing of media attention may transform an unknown individual into a virtual celebrity almost overnight. The possibility therefore exists that by relying on this snowballing of attention a media defendant might be able to bootstrap itself into first amendment protection. Such a sequence of events might concededly defeat public figure status in an appropriate case, but plaintiff's situation is not such a case.[123]

In another Third Circuit case later the same year, *McDowell v. Paiewonsky*,[124] the plaintiff similarly argued that he never sought public figure status and thus could not be deemed a public figure.[125] The Third Circuit held, however, that McDowell was a limited public figure because although "[i]t is true that becoming a public figure generally involves

---

[122] *Id.* at 1086. The Third Circuit observed that "Marcone, along with 24 other co-defendants was indicted in Detroit for allegedly participating in a nationwide drug trafficking ring which at that time reportedly was the largest drug smuggling case in United States history," and that his indictment "was widely reported by the Philadelphia area media." *Id.* at 1085. The government later withdrew the conspiracy charge, and he was not subsequently reindicted. He had gained notoriety as a result of his legal representation of two motorcycle gangs and through other contacts with gangs outside of his legal representations. The court observed that nothing in the record indicated that Marcone was engaged in bringing attention to his clients or to himself through their legal relationships. Rather, Marcone's voluntary connections with motorcycle gangs, including his weekend trips with them, in connection with the intense media attention he engendered was sufficient for the court to deem him a public figure for the limited purpose of his connection with illicit drug trafficking.

[123] *Id.*

[124] 769 F.2d 942 (3d Cir. 1985).

[125] *Id.* at 949.

some notion of voluntariness," that "voluntariness requirement may be satisfied even though an individual does not intend to attract attention by his actions."[126] If that individual "undertakes a course of conduct that invites attention, even though such attention is neither sought nor desired, he may be deemed a public figure."[127] In *McDowell*, the plaintiff satisfied the voluntariness requirement by being an architect associated with a particular school construction project and agreeing to an "impossible task" of completing architectural plans for a school on an impossible time frame.[128] This project previously had been the subject of substantial media attention and had been the subject of two official investigations which led to the issuance of highly critical reports by the Attorney General and the United States Comptroller for the Virgin Islands.

This view that limited public figure status can be achieved without seeking a public role or voice to influence a public controversy is somewhat in tension with the emphasis on voluntary entry into public life and assumption of the attendant risks that is central to the Supreme Court's decisions in *Gertz, Firestone, Wolston,* and *Hutchinson*. In *Firestone*, Mary Alice Firestone did not thrust herself to the forefront of any particular public controversy in order to influence the issues involved in it because filing for divorce did not constitute a voluntary act or assumption of risk sufficient to make her a public figure.

---

[126] *Id.*

[127] *Id.*

[128] *Id.* at 950 ("McDowell's decision to accept the Bovoni assignment almost inevitably put him into the vortex of a public controversy. Just as a professional athlete or coach must accept the attendant publicity surrounding his decision to assume his position, so must plaintiff accept the consequences of his decision.").

Similarly, in *Wolston*, although Wolston chose not to respond to a court subpoena, he did not voluntarily enter the controversy surrounding investigation into Soviet espionage, but instead, was dragged unwillingly into the controversy by the government's investigations. In *Hutchinson*, although Hutchinson was a writer for professional journals who arguably did seek a public platform for his research, he also had not sufficiently thrust himself or his views into the public eye. In the Supreme Court's cases, the central question seems to be whether the plaintiff voluntarily sought a position of prominence to have influence over the public controversy, not whether the plaintiff voluntarily took some action that attracted media attention.[129]

Further complicating the analysis is the recognition by a number of courts that a person may begin a controversy as a private figure and become a limited public figure at some point during the course of the controversy. In *Quigley v. Rosenthal*,[130] a group of Jewish homeowners and their neighbors had a dispute arise over allegedly anti-Semitic statements. The district court held that in the early stages of the controversy the plaintiffs were private figures but that as the controversy became increasingly publicized, the plaintiffs eventually achieved limited public figure status. The court applied the private

---

[129] Nor has the United States Supreme Court shed any additional light on its observation in *Gertz* that, "[h]ypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare." *Gertz*, 418 U.S. at 345. However, *Firestone*, *Wolston* and *Hutchinson* seem to retreat from *Gertz's* dicta regarding involuntary public figures and, instead, rigorously emphasize the plaintiff's voluntary involvement in the public controversy, assumption of risk and attempts to influence the outcome of the controversy.

[130] *Quigley v. Rosenthal*, 43 F.Supp.2d 1163 (D. Colo. 1999).

figure standard to the aspects of the defamation suit that arose before the plaintiffs became limited public figures, and the public figure standard to the aspects that arose after.

The only case our Delaware Supreme Court has discussed limited public figure status is *Gannett Co., Inc. v. Re*.[131] Inventor Ronald Re filed a defamation suit against Gannett Co., the defendant newspaper publisher of The News Journal Company, which had published a report that a car powered by compressed air that Re had invented had failed to start at a demonstration. In assessing whether Re was a limited public figure, our Court noted that the United States Supreme Court has not issued a comprehensive ruling as to precisely which persons are to be regarded as public figures, but we quoted the guidelines from *Gertz* that "[m]ore commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment."[132] We then held that the public issue with which Re allegedly involved himself, the energy crisis, was not actually a controversy but was instead a matter of public concern.[133] Because we decided the case based upon the lack of a public controversy, we did not reach the issue of whether he had voluntarily thrust himself to the forefront of a controversy. Thus, this Court has not had occasion to shape the contours of the limited public issue.

---

[131] *Gannett Co., Inc. v. Re*, 496 A.2d 553 (Del. 1985). In *Page v. Oath*, Carter Page "did not dispute that he was a limited purpose public figure, requiring him to show the statements in the articles were false or not substantially true, and made with actual malice." 270 A.3d at 845.

[132] *Id.* at 556 (quoting *Gertz*, 418 U.S. at 345).

[133] *Id.* at 556–57.

80

In this case, the Superior Court cited *Gertz* for the proposition that to be a limited public figure a plaintiff must "thrust [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved" and that he must "invite attention and comment."[134] The entirety of the Superior Court's reasoning for concluding that Mac Isaac was a limited public figure is the following:

> Here, Mac Isaac clearly thrust himself into this controversy. He now says that he wished to remain anonymous, but he put events into motion that he surely knew would spin out of control. He argues in his briefs that the two initial interviews he gave to the media—one of which was nearly an hour long—shortly after the New York Post published the article were coerced and not voluntary because he was ambushed by the reporters. But he took many other acts that put himself into the controversy. He tried to get his version of events published by the Wall Street Journal and the Washington Post, and then later published the article online. He claims his motivations for getting his statement published was to "set the record straight" and to "get the true story out to people." He also admits that he was frustrated that then-president Trump did not have access to the laptop's data during his impeachment trial. As to his ongoing public involvement—including publishing a book about the laptop controversy and attending conferences where he sells copies of the information from the laptop—he claims he is only doing so because he needs to earn a living to replace the income he lost when he closed the Mac Shop. But, regardless of his motivations, Mac Isaac voluntarily thrust himself into the controversy, thereby making himself a limited public figure.[135]

The Superior Court found that Mac Isaac was a limited public figure because he "voluntarily thrust himself into the controversy" by putting "events in motion that he surely knew would spin out of control," by giving media interviews, by "trying to get his version of events published" by major newspapers, and by his "ongoing public involvement,"

---

[134] *Mac Isaac*, 2024 WL 4371035, at *5 (quoting *Gertz*, 418 U.S. at 345).

[135] *Mac Isaac*, 2024 WL 4371035, at *5.

including publishing a book about the laptop controversy. Each of these justifications for labeling Mac Isaac a limited public figure is problematic, and I take each in turn.

First, the Superior Court's finding that Mac Isaac voluntarily thrust himself into the controversy by "putting events in motion that he surely knew would spin out of control" seems to refer to Mac Isaac voluntarily giving the Biden laptop data to the FBI and Costello. This reasoning seems to depart from the reasoning that is at the heart of the Supreme Court's limited public figure findings, namely, that it is the assumption of risk and the voluntary seeking to influence the resolution of a public controversy that matters. Supplying evidence of possible criminal activity to law enforcement or possible exculpatory evidence does not equate to thrusting oneself into a matter of public controversy in my view. Although these events occurred within the broader context of an impending United States presidential election, undoubtedly a public controversy, Mac Isaac has not alleged that he sought to influence the outcome of the election by giving the laptop data to the FBI or Costello. It was not Mac Isaac who gave the laptop data to the media. At least at this stage, his allegations to that effect are presumed to be true. Further, it is at least open to serious debate as to whether the act of providing potentially relevant information to governmental authorities and law enforcement (and requesting anonymity) is the kind of voluntary thrusting oneself into a controversy that was contemplated in the Supreme Court's trilogy of cases. I doubt that it is.

The Superior Court also makes the mistake of collapsing the relevant time period. Here we must determine whether Mac Isaac was a public figure at the time of the Politico

82

publication – October 19, 2020.  Events *after* that are not relevant to this determination.[136]

One thing the parties agree on here is that even a private citizen can become a public figure over the course of events.  There is no indication that Mac Isaac sought fame or to influence the resolution of any pre-existing public controversy in the narrow timeframe when he gave the laptop data to the FBI or to Costello and *before* publication of the Politico article on October 19, 2020.  At that point, his only media involvement was the initial New York Post story and later follow-up story by the Daily Beast had been published five days previously on October 14.[137]  His stated purpose for giving the laptop data to the FBI and to Costello was that he believed the laptop data contained evidence of criminal conduct that could be important and relevant to the FBI for law enforcement purposes or to Donald Trump for his impeachment defense.  He sought anonymity.  The media reporting, particularly by Politico, on the source of the laptop data later created a public controversy around the source of the laptop data, but as *Hutchinson* made clear, the media cannot

---

[136]  *See, e.g.*, *Quigley*, 43 F.Supp.2d at 1177 (observing that "[a]t the time of the allegedly defamatory statements in this case, Rosenthal had received merely one unsolicited request from the press based on the filing of the lawsuit" and concluding that "the Quigleys were no[t] public figures subject at that point, and Rosenthal's statements about them are, accordingly, not subject to the higher standard.").  But here, the "many other acts that put [Mac Isaac] into the controversy" cited by the Superior Court all came after Politico's publication of the alleged defamatory statement.

[137]  There seems to be a mistake in the trial court's recitation of the facts.  The trial court stated that Mac Isaac gave several interviews under duress, but there was only one media interview with multiple reporters from different news agencies on the afternoon of October 14, 2020.  2024 WL 4371035 at *2.

bootstrap itself into first amendment protection by relying on its own media coverage to create a public controversy and limited public figure status.[138]

Nor does basing a finding of limited public figure status on the lone and uninvited interview align with *Gertz* and its progeny.[139] Based upon his allegations, it is not reasonable to infer that he intended to affect the outcome of any public controversy by talking to the reporters who "accosted" him in his shop. And when Mac Isaac later sought to have his "side of the story" published in a major newspaper, it was ten days later, after and in response to the Politico headline. Importantly, Mac Isaac could not find a reputable newspaper with a wide readership to publish his version of events. This further indicates that even at the end of October, after the Politico headline was published, Mac Isaac did not have the "regular and continuing access to the media that is one of the accouterments of having become a public figure."[140] The rest of Mac Isaac's media interviews did not begin until months later and his book was not published until two years later.

---

[138] *Hutchinson*, 443 U.S. at 135 ("Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.").

[139] *See, e.g.*, *Time Inc. v. Firestone*, 424 U.S. at 454, n.3. There, the Supreme Court observed:

> Nor do we think the fact that respondent may have held a few press conferences during the divorce proceedings in an attempt to satisfy inquiring reporters converts her into a 'public figure.' Such interviews should have had no effect upon the merits of the legal dispute between respondent and her husband or the outcome of that trial, and we do not think it can be assumed that any such purpose was intended. Moreover, there is no indication that she sought to use the press conferences as a vehicle by which to thrust herself to the forefront of some unrelated controversy in order to influence its resolution.

*See also Gertz*, 418 U.S. at 352 (holding that an attorney was not a public figure even though he voluntarily associated himself with a case that was certain to receive extensive media exposure.).

[140] *Hutchinson*, 443 U.S. at 136.

Given Mac Isaac's reasons for giving the laptop data to the FBI and Costello, his attempts to preserve his anonymity, the fact that he did not seek out media attention, and the fact that he was not seeking a platform from which to influence the outcome of a public controversy, I do not agree with the Superior Court that Mac Isaac voluntarily thrust himself into any public controversy as of October 19, 2020 when the Politico article was published. Accordingly, I believe that Mac Isaac was not a limited public figure at the time Politico published the alleged defamatory headline and that he was not required to plead actual malice.

## D. Conclusion

In sum, I believe that it is at least reasonably conceivable that reasonable readers would recognize the Politico headline as concerning Mac Isaac and defaming him. Further, I believe that Mac Isaac was not a limited public figure at the time Politico published its allegedly defamatory headline. Accordingly, he was not required to plead actual malice. Moreover, he has adequately pled that Politico made provably false statements concerning Russian disinformation that were negligently made. Because I believe Mac Isaac met the lenient pleading standard to survive a Rule 12(b)(6) motion to dismiss, I would reverse the dismissal of his claim against Politico and let his claim against Politico proceed. Accordingly, I respectfully dissent.